IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INLINE CONNECTION CORPORATION, BROADBAND TECHNOLOGY INNOVATIONS, LLC, AND PIE SQUARED, LLC,<br>         Plaintiffs,<br><br>         v.<br><br>AOL TIME WARNER INCORPORATED, et al.,<br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C. A. No. 02-272-MPT |
| INLINE CONNECTION CORPORATION, BROADBAND TECHNOLOGY INNOVATIONS, LLC, AND PIE SQUARED, LLC,<br>         Plaintiffs,<br><br>         v.<br><br>EARTHLINK, INC.,<br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C. A. No. 02-477-MPT<br><br>Consolidated Cases |

**MEMORANDUM OPINION**

Thomas C. Grimm, Esquire and Julia Heaney, Esquire, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, P.O. Box 1347, Wilmington, Delaware 19899.
    Of Counsel: Ky E. Kirby, Esquire, and C. Joël Van Over, Esquire, Bingham McCutchen LLP, Washington, D.C., James B. Lewis, Esquire, Binghan McCutchen LLP, Palo Alto, CA, Donn P. Pickett, Esquire, Bingham McCutchen LLP, San Francisco, California;
Counsel for Plaintiffs Inline Connection Corporation, Broadband Technology Innovations, LLC and Pie Squared, LLC.

Frederick L. Cottrell, III, Esquire, Richards, Layton & Finger, P.A., One Rodney Square, P.O. Box 551, Wilmington, Delaware 19899;
    Of Counsel: Kelly E. Farnan, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, Robert J. Gunther, Jr., Esquire and Kurt M. Rogers, Esquire, Latham & Watkins LLP, New York, New York, David A. Nelson, Esquire, Latham & Watkins LLP, Chicago, Illinois;
Counsel for Defendant America Online, Inc.

Gary W. Lipkin, Esquire, Duane Morris LLP, 1100 North Market Street, 12th Floor, Wilmington, Delaware 19801.
>Of Counsel: L. Norwood Jameson, Esquire and Matthew C. Gaudet, Esquire, Duane Morris LLP, Atlanta, Georgia, Mark Comtois, Esquire, Duane Morris LLP, Washington, D.C.;

Counsel for Defendant EarthLink, Inc.

December 5, 2006

Thynge, U.S. Magistrate Judge

## I. INTRODUCTION

In this patent infringement case, Inline Communication Corporation[1] ("Inline") sued America Online Inc. ("AOL") on April 12, 2002, and EarthLink, Inc. ("EarthLink") on June 4, 2002, alleging infringement of U.S. Patent Nos. 5,844,596 ("the '596 patent"), 6,243,446 ("the '446 patent"), and 6,236,718 ("the '718 patent").[2]

On August 31, 2006, AOL and EarthLink jointly filed a motion for partial summary judgment of limitation of damages pursuant to 35 U.S.C. §287(a) for failure to mark and motions for partial summary judgment and *in limine* to preclude damages for customers provisioned through non-infringing central office ("CO") DSLAMS.[3] On September 20, 2006, Inline responded that 1) its expert's damages' methodology is supported by substantial evidence and therefore, any disagreement regarding appropriate methodologies is not properly determined on summary judgment, and 2) damages should not be limited under §287(a) because there is no product to mark, since Inline did not sell or license to sell products or systems embodying the '446 patent after the

---

[1] Inline initially sued AOL and Earthlink. Since the original filing of the complaints, other plaintiffs have been added because of their contractual relationships with Inline. For ease of reference, all plaintiffs shall be referred to as Inline.

[2] Inline's U.S. Patent No. 6,542,585 ("the '585 patent") was subsequently added to the litigation after it was issued in 2003. The '718 patent is no longer at issue in the litigation. Further, the subject matter of the current motions for summary judgment address damages only with respect to two of the three patents in suit: the '596 patent issued on December 1, 1998 and the '446 patent issued on June 5, 2001.

[3] D.I. 445 (Defendants' Joint Opening Brief in Support of Their Motion for Partial Summary Judgment Limiting Damages Pursuant to 35 U.S.C. § 287(a)); D.I. 441 (Defendants' America Online, Inc.'s and EarthLink, Inc.'s Motion for Partial Summary Judgment and Motion *In Limine* Precluding Damages for Customers Provisioned Through Non-Infringing Central Office DSLAMS).

June 5, 2001 issuance date.[4]

In this opinion, the court will only address the motion on limitation of damages under §287(a) regarding the '446 patent. Since the motion on preclusion of damages for non-infringing CO DSLAMS is intrinsically related to the motion *in limine* to exclude the expert testimony of James E. Malackowski, the court will address those matters in a later opinion.

## II. STANDARD OF REVIEW

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. Pro. 56(c)*. This standard also applies to patent cases. *Johnston v. IVAC Corp.*, 885 F.2d 574, 1576-77 (Fed. Cir. 1989). The party seeking summary judgment bears the initial burden of establishing the lack of a genuinely disputed material fact by demonstrating that there is an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Summary judgment is appropriate when there is no genuine issue of material fact or, when drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court is to give the non-moving party the benefit of all justifiable inferences and must resolve disputed issues of fact in favor of

---

[4] D.I. 473 (Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Partial Summary Judgment Limiting Damages Pursuant to 35 U.S.C. §287(a)); D.I. 476 (Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Partial Summary Judgment and Motion *In Limine* Precluding Damages for Customers Provisioned Through Non-Infringing Central Office DSLAMS).

the non-movant. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, summary judgment is appropriate. *Celotex*, 477 U.S. at 323.

### III. POSITION OF THE PARTIES

AOL and EarthLink argue that Inline should be precluded from recovering damages for any alleged infringement which occurred prior to the dates on which Inline provided actual notice by filing suit on April 12, 2002 and June 4, 2002 respectively. Their primary argument is that Inline and/or its licensee, CAIS,[5] did not provide constructive notice of the '446 patent because it failed to mark any tangible components of the OverVoice system embodying the '596 and '446 patents after they issued.[6] AOL and EarthLink argue that Inline and/or CAIS sold or offered to sell the patented OverVoice system without proper marking before the filing of the lawsuits; therefore, the notice requirements set forth by 35 U.S.C. Section 287(a) were not satisfied. AOL and EarthLink also offer evidence that the OverVoice system contained physical components, such as wall jacks and filters, that could have been marked with the patent numbers.[7]

Inline concedes that damages related to the '596 patent should begin on the

---

[5] CAIS is also referred to as Ardent Communication, its successor during bankruptcy proceedings.

[6] The OverVoice system is covered by the '596 and the '446 patents. *See* D.I. 443, Ex. F at 878:5-879:5 (Goodman Dep. Tr. dated Mar. 21, 2003) (noting that the wall jack for the OverVoice system corresponds to the '446 patent). David Goodman is the owner of Inline and the inventor of the '596 and '446 patents.

[7] *See* D.I. 443, Ex. D, CAIS Prospectus (showing an image of a wall jack component of the OverVoice system).

dates on which the lawsuits were filed because it can not demonstrate "consistent and continuous" marking.[8] Inline asserts, that "[t]he same analysis, however, does not apply to the '446 patent."[9] Inline contends that damages for infringement of the '446 patent should begin on June 5, 2001, its issuance date, rather than from the filing of the actions, because there is no evidence after June 5, 2001 of any sales of products or systems that embody the '446 patent. Therefore, the requirements of § 287(a) were not triggered and a duty to mark on the part of Inline or its licensee, CAIS, did not exist.[10]

## IV. ANALYSIS

As a general matter, patentees must comply with the marking statute in order to recover damages for infringement. The statute provides as follows in pertinent part:

> [p]atentees, and persons *making, offering for sale, or selling* within the United States any patented article for or under them . . . may give notice to the public that the same is patented by fixing thereon the word "patent' or the abbreviation "pat.," together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. *In the event of failure to do so*, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.[11] (emphasis added).

---

[8] In light of Inline's concession regarding the '596 patent, the court's focus on the marking issue will be directed to the '446 patent.

[9] D.I. 473 at 1.

[10] As discussed later herein, Inline licensed CAIS prior to the issuance of the '446 patent.

[11] 35 USC § 287(b)(5)(a) further defines "notice of infringement" as actual knowledge, or receipt by a person of a written notification, or a combination thereof, or information sufficient to persuade a reasonable person that it is likely that a product was made by a process patented in the United States.

35 U.S.C. §287(a). The purpose of the statute is threefold in that it gives patentees the incentive to mark their product and, thus, place the world on notice of the existence of a patent, avoids innocent infringement, and aids the public in identifying patented articles. *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998). Consequently, a patentee is entitled to damages from the time when it either began marking products in compliance with § 287(a), or when it notified the infringer through actual notice, whichever is earlier. *Am. Med. Sys., Inc., v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993). Section 287(a) permits either constructive notice, where the patentee marks the article or product with the patent number, or actual notice. *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062 (Fed. Cir. 1987). Actual notice is an affirmative communication by the patentee of a specific charge of infringement against an accused product, device or process. *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001).

At issue is whether Inline's failure to mark products embodying the '446 patent after the June 5, 2001 issuance date creates a genuine issue of material fact regarding period of time when AOL and EarthLink are potentially liable for damages under § 287(a). AOL and EarthLink contend that Inline's licensee, CAIS, sold unmarked products, which embodied the '446 patent, after the issuance date. According to AOL and EarthLink, absent evidence of continuous and consistent marking, notice was not provided until the filing of the lawsuits. Inline asserts that it did not sell or license products embodying the '446 patent after June 5, 2001. Inline supports its position by referring to the June 1, 2001 Termination/Nonexclusive License Agreement with CAIS. Although not entirely clear, Inline seems to argue that, because it was a "non-producing

patentee," absent evidence of sales of products embodying the '446 patent after June 5, 2001, recordation of the patent in the USPTO satisfies the notice requirement under § 287(a).[12]

Although Inline was neither required to mark nor have CAIS, its licensee, mark products or systems prior to the issuance of the '446 patent, Inline is not entitled to damages until the date on which actual notice of infringement was provided to AOL and EarthLink, because its licensee continued to sell and offer for sale, services and products embodying the '446 patent after that patent issued. Moreover, Inline authorized its licensee to continue sell systems covered by the '446 patent after it issued, as evidenced by the Termination/Nonexclusive License Agreement.

There can be no dispute that the '446 patent is a continuation of the '596 patent. See U.S. Patent No. 6,243,446 B1 (related U.S. Application Data indicates that patent '446 is a "[c]ontinuation of . . . Pat. No. 5,8444,596," (issued December 1, 1998.)). The '596 patent itself is a continuation of Pat. No. 5,010,399, which issued on April 23, 1991. As a result, the '446 patent is a progeny of the '399 patent.

The "Agreement for Cooperative Use of Communication Patents" executed in 1996 between Inline and CAIS ("1996 Agreement") granted CAIS exclusive intellectual

---

[12] In the case of a "non-producing patentee," § 287(a) does not preclude recovery of damages for the period of time when *no product covered by the patent is produced or sold. Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 00-981-KAJ, 2003 U.S. Dist. LEXIS 5409, *50 (D. Del. Feb. 4, 2003), *rev'd on other grounds*, 262 F.Supp.2d 358 (D. Del. 2003). Thus, recordation of a patent with the USPTO will serve as constructive notice of the patent's existence and § 287(a) will not limit damages. *Id.* at *51. *See also Wine Railway Appliance Co. v. Enterprise Ry. Equipment Co.*, 297 U.S. 387 (1936); *Texas Digital Sys., Inc., v. Telegenix, Inc.*, 308 F.3d 1193 (Fed Cir. 2002) (holding that constructive notice of a patent is presumed in the case of the non-producing patentee). As discussed herein, the court need not address whether Inline is a non-producing patentee for the purposes of § 287(a).

property rights in the Twisted Pair Patents ("TWP").[13] The opening paragraph of the 1996 Agreement specifically states that Inline

> owns patents . . . describing new techniques for, among other things, communicating video and high data rate digital signals over twisted pair wires . . . (these patents are listed in Appendix I) which patents and applications, together with all presently existing and hereafter created inventions, improvements or ideas related thereto and all subsequent modifications, divisions, *continuations*, re-issues, extensions . . . or *otherwise arising from such patents or applications* being collectively referred to [as] the "twisted pair patents" or "TWP patents. (emphasis added).[14]

Appendix I of the 1996 Agreement lists those patents and patent applications which are encompassed by that paragraph. The first patent listed in the appendix is the '399 patent. Also contained in Appendix I are three pending applications filed on December 5, 1991, one of which is the '596 patent (entitled "Two-Way RF Communication at Points of Convergence of Wire Pairs from Separate Internal Telephone Networks"). Because the '446 patent is a continuation of the '596 patent, it falls within the broad language of the 1996 Agreement which provides that the CAIS' license extended to later created continuations[15] and those "*otherwise arising from* such patents or applications."[16] On June 1, 2001, under the Termination/Nonexclusive License Agreement, CAIS' exclusive

---

[13] D.I. 475, Ex. 1. The provisions of 1996 Agreement make it clear that CAIS purchased rights to the TWP patents and became Inline's exclusive licensee "to use, make, sub-license or sell on a world-wide basis . . . any technology covered by the TWP patents," along with the obligation to fully exploit the technology. *Id.* at 1, 4, 11.

[14] *Id.*

[15] That language includes presently existing inventions and "*hereafter created . . . continuations*" of those inventions.  (emphasis added).

[16] *Id.* Section 2 of the 1996 Agreement also expressly grants to CAIS in its *sole and exclusive discretion* to use, as it determines necessary, desirable or appropriate, any technology covered by the TWP patents.

license was terminated. Contrary to Inline's position, that agreement did not end CAIS' right to sell products covered by the TWP patents.[17] Therefore, the '446 patent falls squarely within the purview of Termination/Nonexclusive License Agreement which continued after the issuance of the '446 patent.

CAIS first installed the OverVoice system that embodied the '596 patent (and later the '446 patent) in 1997, which predates the issuance of either patent, in hotels and apartments in Arlington, Virginia.[18] No party disputes that the OverVoice system encompasses both patents. In fact, both sides rely on the testimony of Inline's President, David Goodman as proving that the OverVoice system is covered by the '596 and '446 patents.[19]

Inline's position is that it never sold products embodying the '446 patent after the patent issued and therefore, it did not have a duty to mark. In support of its position, Inline relies on §20.03[7][c][i] of *Chisum on Patents*, which states, "[t]here is no duty to mark or give notice in lieu thereof if the patent owner neither sells *nor authorizes others to sell* articles covered by the patent." (emphasis added). Inline also points to the 2001 Termination/Nonexclusive License Agreement as evidence of its intent to "abandon the part of its business covered by" the '446 patent.[20] Although that agreement ended the 1996 Agreement, the preclusive effect of §287(a) is triggered because CAIS was still

---

[17] D.I. 492, Ex. JJ. In the Termination/Nonexclusive License Agreement, CAIS assigned and transferred all right, title, and interest in the TWP patents to Inline, for which CAIS was granted a nonexclusive license for only its hotel and other hospitality customers.

[18] See D.I. 445 at 3.

[19] See D.I. 443, Ex. F at 878:5-879:5

[20] See D.I. 473 at 2.

authorized as a nonexclusive licensee to sell or offer for sale products and systems covered by the TWP patents. Inline expressly granted CAIS a

> non-exclusive fully paid-up perpetual right and license to make equipment and systems *embodying any inventions in the TWP patents*, to sell and offer for sale such equipment and systems to, and to use such equipment and systems, at hotels and hospitality facilities only. . . [it] shall further include the right and license to use any equipment and systems embodying the inventions claimed in the TWP patents, such use to be only in connection with the making of such equipment and systems . . . in, hotel and hospitality facilities. The right and license to CAIS shall extend *also to the hotel and facilities' owners, and their successors*, for their use of such equipment and systems at the hotel and hospital facilities.[21] (emphasis added).

The language above clearly demonstrates that CAIS continued as a licensee of Inline, whereby it was authorized to sell or offer for sale, without any obligation to mark, patented products and methods when a duty to mark existed under §287(a). Therefore, Inline's inference that the 2001 Termination/Nonexclusive License Agreement ended its business relationship with CAIS is inaccurate. Moreover, the quoted language does not demonstrate its intent to "abandon" any business related to the '446 patent. Whether, as a result of that agreement, Inline received or continued to receive any payments, royalties or other compensation is irrelevant. It is the right to make, sell, offer for sale or publically use the patented article that triggers the obligation to mark.

The remaining dispositive issue is whether CAIS produced, sold, or offered for sale, products or methods covered by the '446 patent without proper marking after June 5, 2001. On that issue, the court concludes that CAIS did, in fact, sell and offer to sell

---

[21] *See* D.I. 492, Ex. JJ at Section 3.

the OverVoice system to customers after June 5, 2001.

In support of their position, AOL and EarthLink contend that the bankruptcy court proceedings involving CAIS and several Hilton Hotels demonstrate that CAIS sold the OverVoice system after June 5, 2001. In 1998, CAIS executed a Master License Agreement with the Hilton Hotels Corporation ("HHC") to provide high speed internet access to hotel guests.[22] Under the agreement, CAIS provided high speed data communications service for use with computer equipment "to access the public Internet through dedicated . . . telecommunication lines." Further, CAIS, at its expense, was to install, maintain, operate, repair, upgrade, replace and construct necessary improvements, which included connections for power and telephone lines, for the equipment and service. Each hotel was to pay CAIS usage fees on a monthly basis."[23] On October 10, 2001, Ardent Communications (successor to CAIS) filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[24] Following those proceedings, CAIS/Ardent sued multiple Hilton entities for failure to remit the proper amount of usage fees between 1999 and October 2002.[25]

Contrary to Inline's argument that the various Hilton entities used the OverVoice systems on an unlicensed basis, there is ample evidence which shows that such use was authorized. As noted previously herein, the Master License Agreement authorizes

---

[22] The Master License Agreement was executed approximately three years before the 2001 Termination/Nonexclusive License Agreement between Inline and CAIS.

[23] D.I. 492, Ex. KK at 4.

[24] D.I. 492, Ex. KK at 5.

[25] In February 2004, Ardent brought suit against 6 Hilton entities for collection of fees allegedly owed by each defendant under the Master License Agreement.

use of the system installed by CAIS/Ardent. There is no evidence presented that the agreement was terminated by either HHC or CAIS/Ardent either shortly after the Termination/Nonexclusivity License Agreement between Inline and Cais or shortly after the issuance of the '446 patent. Further, in its itemization of damages against one HHC entity, CAIS/ Ardent lists the amount of $18,954.32 as damages for guest room use in 2001 and estimated damages of $13,241.40 for such use between March 1, 2002 and October 8, 2002.[26] Against another hotel, CAIS/Ardent claims damages in the amount of $51,041.46 for use occurring between August 2000 and July 2001 and estimated damages of $68,943.42 from August 2001 to October 2002.[27] Clearly, CAIS/Ardent is relying on the Master Licensing Agreement with HHC in support of its adversary action for non-payment of usage fees. The fact that CAIS/Ardent entered an agreement with HHC authorizing it to use the OverVoice system for internet services and subsequently sued HHC entities on that agreement for failure to pay, refutes Inline's argument that HHC's activities were somehow unauthorized. Whether certain HHC entities failed to properly pay for that usage goes to the issue of contractual damages, not authorized use. There is no evidence that Inline has objected to or intervened for infringement or unauthorized use in the CAIS/Ardent actions against HHC entities. There is no evidence that Inline has sued those entities or CAIS/Ardent for infringement or unauthorized use. There has been no suggestion that Inline objected to CAIS/Ardent's right to pursue its claims against the HHC entities. Such conduct shows that CAIS/Ardent had a limited

---

[26] D.I. 492, Ex. KK at 13 (Itemization of Plaintiff's [Ardent] Damages). Those figures are damages calculated against the defendant, San Francisco Hilton, Inc.

[27] D.I. 492, Ex. KK. Those figures are damages calculated against the defendant, FC 42 Hotel, LLC.

right to sell products and methods covered by the '446 patent. Moreover, CAIS/Ardent sued for usage fees incurred *after* June 5, 2001 which confirms, that it offered and provided services embodied by the '446 patent after its issuance date.

All parties acknowledge that the OverVoice system is covered by the '596 and '446 patents.[28] Inline suggests that CAIS' sale of a service, the highspeed internet, is not a "product" for purposes of §287(a); rather, it contends that CAIS was merely selling or offering to sell internet access through "previously installed" OverVoice systems. This argument fails. The Federal Circuit has consistently held that "where there are both product and method claims being claimed infringed, the patentee must mark the product" pursuant to §287(a) in order to recover damages.[29] Therefore, Inline's failure to require CAIS to mark components of the OverVoice system, specifically the wall jack, after the '446 patent issued precludes it from recovering pre-litigation damages.

Since there is no genuine issue of material fact, AOL and EarthLink's motion to for partial summary judgment limiting damages pursuant to 35 U.S.C. §287(a) is granted.

---

[28] D.I. 443, Ex. F. In his deposition testimony, Goodman acknowledges that the wall jack for the OverVoice system is covered by the '596 and '446 patents. Goodman also admits that, although the wall jack is only "one component of the OverVoice System," it "in its totality . . . embodies the teachings of [the '596 and '446] patents."

[29] *See American Med. Sys., Inc. v. Medical Eng'g Corp.*, 6 F.3d 1523, 1538-1539 (Fed. Cir. 1993)("To the extent that there is a tangible item to mark by which notice of the asserted method claims can be given, a party is obliged to do so if it intends to avail itself of the constructive notice provisions of section 287(a)."); *see also IMX, Inc. v. Lendingtree, LLC*, No. 03-1067-SLR, 2005 U.S. Dist. LEXIS 33179 (D. Del. Dec. 14, 2005) (holding that "where there is a tangible item to mark by which notice of the asserted patent can be given" a party is required to do so in order to satisfy the requirements of §287(a)).