**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

INLINE CONNECTION CORPORATION, )
BROADBAND TECHNOLOGY )
INNOVATIONS, LLC, AND )
PIE SQUARED, LLC, )
   Plaintiffs, ) C. A. No. 02-272-MPT
     ) C. A. No. 02-477-MPT
   v. ) <u>Consolidated Cases</u>
     )
EARTHLINK, INC., )
   Defendant. )

## <u>MEMORANDUM OPINION</u>

Thomas C. Grimm, Esquire and Julia Heaney, Esquire, Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, P.. Box 1347, Wilmington, Delaware 19899; Frank P. Porcelli, Esquire and Stamatios Stamoulis, Esquire, Fish & Richardson P.C., 919 N. Market Street, Suite 1100, Wilmington, DE 19899-1114.
   <u>Of Counsel</u>: Ky E. Kirby, Esquire, Bingham McCutchen LLP, Washington, D.C., James B. Lewis, Esquire and Mary T. Huser, Esquire, Binghan McCutchen LLP, Palo Alto, CA; Donn P. Pickett, Bingham McCutchen LLP, San Francisco, CA;
Counsel for Plaintiffs Inline Connection Corporation, Broadband Technology Innovations, LLC and Pie Squared, LLC.

Daniel v. Folt, Esquire, Duane Morris LLP, 1100 North Market Street, 12th Floor, Wilmington, Delaware 19801.
   <u>Of Counsel</u>: L. Norwood Jameson, Esquire and Matthew C. Gaudet, Esquire, Duane Morris LLP, Atlanta, Georgia, Mark Comtois, Esquire, Duane Morris LLP, Washington, D.C.;
Counsel for Defendant EarthLink, Inc.

_____

Wilmington, Delaware
February 5, 2010

**Thynge, U.S. Magistrate Judge**

## I. INTRODUCTION

This is a patent infringement case. On June 4, 2002, Inline Communication Corporation[1] ("Inline")[2] filed suit against EarthLink, Inc. ("EarthLink"),[3] alleging infringement of U.S. Patent Nos. 5,844,596 ("the '596 patent"), 6,243,446 ("the '446 patent"), and 6,236,718 ("the '718 patent").[4] Inline's U.S. Patent No. 6,542,585 ("the '585 patent") was subsequently added to the litigation after it issued in 2003.[5]

The trial in this matter began on February 7, 2007. At trial, Inline asserted infringement of claim 61 of the '596 patent; claims 1, 2, 3, 4, and 5 of the '446 patent; and claims 1, 2, 4, 8, and 9 of the '585 patent. EarthLink denied infringement and alleged that the asserted claims were anticipated and obvious, and that the patents failed to comply with written description and enablement requirements of 35 U.S.C. § 112. After the close of all evidence on February 13, 2007, Inline moved for judgment as a matter of law under Fed. R. Civ. P. 50 (a). On February 15, 2007, the jury returned a verdict of non-infringement and that the each asserted claims were invalid as anticipated and obvious and that each of the patents failed to comply with the written

---

[1] Inline initially sued EarthLink. Since the original filing of the complaints, other plaintiffs were added because of their contractual relationships with Inline. For ease of reference all plaintiffs shall be referred to as "Inline" or "plaintiffs."

[2] Inline is a Virginia corporation with its principal place of business in Virginia.

[3] EarthLink is a Delaware corporation with its principal place of business in Georgia.

[4] In light of the court's modification of is claim construction of one of the disputed claim terms, Inline withdrew the '718 patent from the suit.

[5] The '596, '446, and the '585 patents are each continuations of a patent application filed July 14, 1989 that issued as U.S. Patent No. 5,010,399 ("the '399 patent") on Aril 23, 1991 and is not asserted in this action. More specifically, the '585 patent is a continuation of the application that resulted in the '446 patent, which is a continuation of the application that resulted in the '596 patent. The three patents share a substantially identical written disclosure.

Because the '596 line of patents each share a substantially identical written disclosure, citation to the '596 patent's written description ("common specification" or "the specification") in this opinion should be understood to refer to the same language in the written descriptions of the '446 patent and the '585 patent.

description and enablement requirements of section 112.[6]  Currently before the court is

Inline's renewed motion for judgment as a matter of law under Rule 50(a), or in the

alternative for a new trial pursuant to Rule 59(a).[7]  Inline contends that there is no

legally sufficient basis to support any of the jury's findings and, therefore, its motion

should be granted.[8]

## II.  BACKGROUND

The technology in this case involves a system of transmitting high frequency data

signals and lower frequency voice band signals over conventional telephone wiring.

EarthLink, at the time of the initial action, was one of the leading internet service

providers ("ISPs").  Inline alleged that EarthLink used its patented system, without

permission, to make DSL products more attractive to consumers.  According to Inline,

although alternatives to the DSL products offered by EarthLink exist, using the Inline

system allows products to be offered without incurring installation charges every time a

new DSL customer is added, merely by having the customer "self-install" filters and

modem devices within the home.

In addition to providing DSL services, EarthLink offers subscribers internet

access through "dial-up" service.  Initially, ISPs provided internet access only through

---

[6] *See* D.I. 664 (Jury Verdict).  EarthLink argues that four items of prior art each anticipated the claims of the patents-in-suit.  The jury's verdict sheet did not indicate which of those references the jury based its anticipation verdict on, nor did the verdict sheet as proposed by the parties request that indication.

[7] D.I. 681

[8] After briefing was completed on Inline's motion, EarthLink filed a motion to file a sur-reply brief "to correct the record as to certain mischaracterizations of the law and the trial record by Inline, and to ensure that the court has the proper context for resolving Inline's motion for judgment as a matter of law."  D.I. 694.  Inline did "not object in principle to the idea of a sur-reply brief," but contends that EarthLink's proposed sur-reply brief contains facts that purportedly need their own correction and requests the court to consider Inline's response to EarthLink's brief if it is considered.  D.I. 695.  In light of Inline's position, the court grant's EarthLink's motion and will consider both EarthLink's sur-reply brief and Inline's response thereto.

dial-up service.  Like DSL service, dial-up service allows computer users to access the internet via telephone lines.  In order to connect to the internet using dial-up service, residential users may open an account with an ISP and are then provided with one or more telephone numbers linked to the ISP's computer.  The dial-up modem is used to connect the user's computer to the ISP's computer, which in turn is connected to the internet.

However, dial-up internet service has limitations, which may be remedied by using DSL service.  If dial-up service is being used to connect to the internet, the telephone line cannot simultaneously be used to send telephone voice signals.  Thus, dial-up service users cannot make and receive telephone calls while connected to the internet.  Additionally, computers have the capability to connect to the internet and communicate data at a higher rate than the rate afforded by a dial-up modem.  The theoretical limit at which dial-up modems can exchange data over a conventional dial-up telephone connection is approximately 56,000 bits per second ("56 Kbps").  As a result, a 56K modem may be limited in the speed of transferring data to users.

A.  *Asymmetric Digital Subscriber Line ("ADSL") Technology*

One type of DSL technology is ADSL technology.  ADSL is used as an alternative to dial-up internet service.  At its most basic level, ADSL technology involves the high-speed transmission of packets of digital data back and forth from, among other things, the internet to a user's computer.  ADSL technology takes advantage of the existing telephone networks used for telephone services to send digital data between the internet and a computer (and vice versa) at higher rates of speed than dial-up service.

Moreover, an ADSL link has a potentially different connection path to the internet than dial up service.  An ADSL modem at a customer's residence connects to a companion modem at a central office, which, in turn, is connected to the internet through a central office computer.  Unlike dial-up internet service, ADSL allows simultaneous transmission of low frequency voice signals and higher frequency digital data signals over the same telephone line to and from the public telephone network. Thus, the ADSL user may talk simultaneously on the telephone and connect to the internet via the same telephone line because the data and voice frequency ranges can be cleanly separated.

This arrangement permits higher data transmission rates than available on dial-up modems.  As a result, ADSL is capable of using subscriber loops to communicate two-way voice signals, upstream data signals, and downstream data signals within different frequency bands.  Data transfers can be optimized by allocating more of the frequency range to the data transfers from the central office to the customer than in the opposite direction.  ADSL can download data as high as 1.5 million bits per second ("1.5 Mbps"), which is more than 25 times the speed of the maximum dial-up modem rate of 56 Kbps.

### B.  The Asserted Patented Invention

The three patents at issue at trial are directed toward transmitting data signals of different frequencies over conventional telephone wiring.  Inline contends that the patents disclose a unique way of enhancing the plain old telephone system ("POTS") to distribute any type of information over telephone wires that traditionally carry telephone calls to a location.  These patents describe a system for sharing a telephone wire

between information signals, confined to different frequency ranges.  The asserted system uses filters to essentially block voice signals at a voice frequency range and pass the information signals at an information frequency range, and vice versa.

The systems disclosed in the '596 family of patents include a signal interface that transmits information from an external source of information along the shared telephone wire to individual households.  Inside a household, a transreceiver connected to the shared telephone wire receives information and converts it to data.  The shared telephone wire remains connected to the telephone, which continues its traditional use of making and receiving telephone calls, except that filters are installed at the telephone to prevent interference with the high frequency information signals.

### III.  STANDARD OF REVIEW

A.    *Judgment as a Matter of Law*

Judgment as a matter of law ("JMOL") is governed by Fed. R. Civ. P. 50.  When evaluating a motion for JMOL, the court reviews the jury's decision to determine if it is reasonably supported by the evidence.[9]  To prevail on a motion for JMOL, the moving party "'must show that the jury's findings, presumed or express are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings.'"[10]  "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review."[11]  Defined another

---

[9] *Arthrocare Corp. v. Smith & Nephew Inc.*, 310 F. Supp. 2d 638, 652 (D. Del. 2004).

[10] *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (citations omitted).

[11] *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

5

way, substantial evidence is evidence that a reasonable individual might accept as

supporting the jury's decision.[12]  To determine the sufficiency of the JMOL motion, a

court must consider all of the evidence in a light most favorable to the non-movant,[13]

and must draw all inferences in favor of the non-moving party:

> In assessing the sufficiency of the evidence the court must give the non-
> moving party, as the verdict winner, the benefit of all logical inferences
> that could be drawn from the evidence presented, resolve all conflicts in
> the evidence in his favor, and in general, view the record in the light most
> favorable to him.[14]

The court may not determine the credibility of witnesses nor substitute its account of the

facts for that of the jury's account.[15]  Motions for JMOL are granted "sparingly" and only

in those circumstances in which "the record is critically deficient of the minimum

quantum of evidence in support of the verdict."[16]  Moreover, "[a] district court may

overturn a jury's verdict only if upon the record before the jury, reasonable jurors could

not reach that verdict."[17]

   While the jury's factual findings receive deference on a motion for JMOL, the

"legal standards that the jury applies, expressly or implicitly, in reaching its verdict are

considered by the district court and the appellate court *de novo* to determine whether

those standards are correct as a matter of law."[18]  The court must insure that the correct

legal standard or law is applied.[19]

---

[12] *C.R. Bard Inc v. U.S. Surgical Corp.*, 258 F. Supp. 2d 355, 358 (D. Del. 2003).

[13] *Dana Corp. v. IPC Limited Partnership*, 860 F.2d 415, 417 (Fed. Cir. 1988).

[14] *Arthrocare Corp.*, 310 F. Supp. 2d at 652 (citing *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d. Cir. 1991); *Perkins-Elmer Corp v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)).

[15] *Id.*

[16] *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003).

[17] *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1353 (Fed. Cir. 2001).

[18] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995) (citing *Baltimore & Carolina Line, Inc. v. Redman*, 295 U.S. 654, 660 (1935)).

[19] *Markman*, 52 F.3d at 975.

B.      Invalidity Defenses

"Anticipation is a factual determination that is reviewed for substantial evidence when decided by a jury."[20]   A jury's verdict on obviousness is reviewed without deference on the conclusion of obviousness, which is a question of law, while "the underlying findings of fact, whether explicit or implicit within the verdict, [are reviewed] for substantial evidence."[21]   The standard of substantial evidence is applied to whether a specification complies with the written description requirement of 35 U.S.C. § 112, ¶ 1.[22]  Since enablement is a matter of law, the findings by the jury are reviewed without deference; however, the factual underpinnings of enablement are determined on the basis of substantial evidence.[23]

## III.  DISCUSSION

The following are the asserted claims of the patents-at-issue.

Claim 61 of the '596 patent recites:

61.  A system for communicating information between an external source of information and a plurality of destinations of information over a telephone wiring network used for passing telephone signals in a telephone voice band between a plurality of telephone devices and a telephone exchange, comprising:

a plurality of transceivers coupled between the telephone wiring network and corresponding destinations of information, each including

circuitry for accepting signals in a high frequency band of frequencies above the highest frequency of the telephone voice band and rejecting signals in the telephone voice band; and

---

[20] *Koito Manufacturing Co., LTD. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1149 (Fed. Cir. 2004); *see also Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1378-79 (Fed. Cir. 2001).
[21] *LNP Eng'g Plastics, Inc.*, 275 F.3d at 1353 (Fed. Cir. 2001).
[22] *Union Oil v. Atl. Richfield Co.*, 208 F.3d 989, 996 (Fed. Cir. 2000).
[23] *BJ Servs. Co. v. Halliburton Energy Serves., Inc.*, 338 F.3d 1368, 1371-72 (Fed. Cir. 2003).

a signal interface coupled between the external source of information and the telephone wiring network, including

circuitry for receiving a plurality of external signals encoding a plurality of information streams from the external source of information, and

circuitry for transmitting to selected sets of one or more of the plurality of transceivers a corresponding plurality of internal signals in the high frequency band each encoding one of the plurality of information streams over the telephone wiring network;

wherein the telephone wiring network includes a branch network which couples one of the plurality of telephone devices to the telephone exchange telephone exchange, and the branch network includes circuitry for preventing transmission of signals in the high frequency band to the one of the telephone devices on the branch network.

Claims 1, 2, 3, 4, and 5 of the '446 patent recite:

1.  A system for communicating information between an external source of information and destinations of information over a telephone wiring network used for passing telephone signals in a telephone voice band between a plurality of telephone devices and a telephone exchange, comprising:

a transceivers coupled between a conductive path of the telephone wiring network and a first destinations of information, including circuitry coupled to said conductive path for accepting signals in a high frequency band of frequencies above the highest frequency of the telephone voice band and rejecting signals in the telephone voice band;

a plurality of filters, each coupled between said conductive path and a corresponding one of the plurality of telephone devices, for preventing transmission of signals in the high frequency band to the telephone devices; and

a signal interface coupled between the external source of information and said conductive path, including

circuitry for receiving an external signal encoding an information stream from the external source of information,

circuitry for transmitting over the telephone wiring network to the transceiver an internal signal in the high frequency band encoding the information stream, and

circuitry for limiting transmission of the internal signal in the high frequency band from the telephone wiring network to the telephone exchange and for passing signals in the telephone frequency band between the telephone wiring network and the telephone exchange;
wherein each of the plurality of filters is coupled to said conductive path at a location separated from the transceiver and from the signal interface.

2.  The system of claim 1 wherein the telephone wiring network includes a plurality of separate conductive paths that includes the first conductive path, each of the plurality of separate conductive paths being coupled to the signal interface.

3.  The system of claim 2 further comprising additional transceivers, each coupled between a different one of the separate conductive paths and a different one of a plurality of destinations of information, wherein the signal interface further includes circuitry for transmitting over the telephone wiring network to each of the additional transceiver an internal signal in the high frequency band.

4.  The system of claim 1 wherein the external signal includes an external data signal encoding a data stream and the internal signal includes an internal data signal encoding the data stream.

5.  The system of claim 4 wherein the transceiver further includes circuitry for receiving the internal data signal and presenting the data stream to the destination of information.

Claims 1, 2, 4, 8, and 9 of the '585 patent recite:

1.  A system for communicating information between an external source of information and destinations of information each at a different one of a plurality of residences over a telephone wiring network used for passing telephone signals in a telephone voice band between telephone devices at the residences and a telephone exchange, comprising:

a plurality of transceivers, each located at a different one of the residences and coupled to a destination of information at said residence;

a signal interface located on the telephone wiring network between the telephone exchange and each of the residences;

a plurality of separate conductive paths, each coupling the signal interface and a different one of the plurality of transceivers and providing at least part of a path for telephone signals in the voice band between the

9

telephone exchange and one or more of the telephone devices at the same residence as said transceiver, wherein each of said separate conductive paths exceeds 1000 feet in length;

at each of the residences at which one of the transceivers is located, a branch conductive path coupled at a location separated from said transceiver to the separate conductive path from the signal interface to said transceiver, said branch conductive path providing at least part of the path for telephone signals in the voice band between the telephone exchange and a telephone device at said residence; and

for each branch conductive path, a filter coupled between the branch conductive path and the corresponding telephone device;

wherein each transceiver includes circuitry for communicating with the signal interface in a high frequency band of frequencies above the highest frequency of the telephone voice band over the separate conductive path coupling said transceiver with the signal interface;

each of the filters that is coupled to a branch conductive path is configured for preventing signals in the high band of frequencies from passing to the telephone device coupled to said branch conductive path; and

the signal interface includes circuitry for receiving a plurality of external signals encoding information streams from the external source of information, circuitry for transmitting over the telephone wiring network to the transceivers a plurality of internal signals in the high frequency band encoding the information streams, and circuitry for limiting transmission of signals in the high frequency band from the telephone wiring network to the telephone exchange and for passing signals in the telephone frequency band between the telephone wiring network and the telephone exchange.

2. The system of claim 1 wherein each external signal includes a corresponding external data signal encoding a data stream and each internal signal includes a corresponding internal data signal encoding said data stream, and wherein the circuitry at each transceiver for communicating with the signal interface further includes circuitry for receiving the corresponding internal data signal and presenting said data stream to the destination of information.

4. The system of claim 1 wherein each of the filters that is coupled to a branch conductive path reflects substantially all of the energy in the high frequency band transmitting from said branch path, and the communication system includes circuitry for mitigating the effect of

reflections so that said transceivers correctly receive internal signals from the signal interface.

8. The system of claim 1 wherein the signal interface includes circuitry for selecting a subset of zero or more transceivers for receipt of each of the information streams accepted from the external source of information.

9. The system of claim 1 further comprising an RJ-11 jack coupled between one of the branch conductive paths and filter connected to said branch.

### A.     Anticipation

At trial, EarthLink presented four anticipatory prior art references:  (1) the VDM System; (2) the Bellcore RFI; (3) the Waring Article; and (4) the Ithell & Jones reference. Inline contends that there is no legally sufficient evidence for the jury to have found, by clear and convincing evidence, that any of those references anticipates the asserted claims.

Before discussing the individual prior art references, the court rejects an overarching argument by Inline that there is necessarily an insoluble inconsistency between the jury's finding of both invalidity and non-infringement.  EarthLink presented five scenarios whether those verdicts could be reconciled.  The court particularly agrees with EarthLink's third argument:

> The jury could have accepted . . . that the telephones were not part of the accused EarthLink ADSL system as a matter of fact and thus Inline did not prove that EarthLink was a direct infringer under 35 U.S.C. § 271(a) . . . but also found that the prior art references disclose telephones (along with Mr. Waring's extensive testimony about telephones) and therefore disclose all the elements necessary to anticipate the claims in a single reference.

This argument is compelling, particularly in that it is one of the bases the court discusses, below, for upholding the jury's verdict of non-infringement.

11

1.    The AT&T Voice Data multiplexer system (the "VDM System")

Inline presents two arguments as to why the VDM System does not anticipate as a matter of law.  First, each of the asserted independent claims of the patents-in-suit[24] requires either "a high frequency band of frequencies above the highest frequency of the telephone voice band," a "high frequency band, " or a "high band of frequencies" (collectively, "the high frequency band limitation").  The court construed these terms to mean "[f]requencies above the telephone voice band between 0.25 MHZ [i.e., 250 kHz] and an undetermined upper limit."[25]  Inline contends there was no evidence presented at trial that the VDM System actually used frequencies above 250 kHz.  Second, Inline argues that, in the VDM System, the data from the external source of information improperly passes through the telephone exchange.

Inline contends that there was no showing that the VDM System actually used frequencies above 250 kHz.  Inline states that Arthur Williams[26] and David Waring each testified that the VDM System did not transmit at the required frequency level.  Williams testified that the VDM System used frequencies between 50 and 100 kHz,[27] and Waring testified similarly.[28]  In light of that testimony, Inline contends that the VDM System lacks at least one express limitation of the asserted claims and, therefore, no reasonable jury could have concluded that the VDM system rendered the patents invalid.

EarthLink counters that the asserted claims are apparatus claims, rather than

---

[24] '596 patent, claim 61; 446 patent, claim 1; and '585 patent, claim 1.

[25] D.I. 285 (Oct. 18, 2005 Claim Construction Order).

[26] Williams was EarthLink's fact witness regarding the public use of the VDM System.

[27] D.I. 649 at 125:13-18 (Williams cross); *see also id.* at 146:2-5 (Williams redirect).

[28] D.I. 654 at 167:5-12 (Waring cross).  Waring also testified that he had no evidence anyone ever used frequencies above 250 kHz in the VDM System.  *Id.* at 167:13-20 (Waring cross); *see also id.* at 260:6-16 (Beckmann direct).

method claims, and none require actual transmission at or above 250 kHz.  EarthLink

contends that the asserted claims only require hardware capable of transmission above

250 kHz and that the evidence shows that the VDM System constitutes such hardware.

EarthLink states that Williams testified that the VDM hardware presented to the jury and

described in the printed publications is the same regardless of whether a user transmits

above or below 250 kHz; that it is the very same "technology" for transmitting above or

below 250 kHz; and that the choice of frequency merely corresponds to the value

settings of some of the components.[29]  Williams also testified that the filters are exactly

the same regardless of the frequency used for transmission.[30]  EarthLink also maintains

that Williams confirmed that he actually tested the VDM System above 250 kHz with the

same hardware.[31]

EarthLink also contends that the record shows that the VDM System fully

enabled the claimed invention; stating that Waring explained the relationship between

frequency and distance (the higher the frequency the shorter the distance, and vice

versa) was fully understood at least by the 1970s, such that one of ordinary skill

immediately would have appreciated that the VDM System's hardware was fully capable

of – and thus fully enabled to – transmit above 250 kHz based on well known and fully

developed electrical engineering principles.[32]  EarthLink states that "[f]urther confirming

this point, Williams in fact transmitted above 250kHz by *simply adjusting the settings*

---

[29] D.I. 649 at 105:16-106:7 (Williams direct).
[30] D.I. 649 at 105:7-14 (Williams direct).
[31] D.I. 648 at 103:8-19 (Williams direct); *id.* at 151:15-23 (Williams redirect).
[32] D.I. 654 at 51:19-53:4 (Waring direct).   Inline's validity expert, Beckmann, also confirmed transmitting signals above 250 kHz over distances greater than 1,000 feet was well known in the art.  D.I. 655 at 54:20-55:12 (Beckmann cross); *id.* at 57:14-19 (Beckmann cross).

based on the well known correlation between frequency and distance."[33]  EarthLink

concludes by stating that the "use of this existing circuitry confirmed what was well

known in that art.  Again, the 'technology' was already present in the hardware; value

setting simply had to be adjusted (just like choosing a volume setting)."[34]  EarthLink

concludes that it was reasonable for the jury to "conclude from all of the evidence that

the actual claims are fully anticipated by the VDM System because the evidence at trial

was sufficient for the jury to conclude that this system contains the *actual hardware and*

*circuitry* that satisfies each element of these system claims."[35]

        The court determines that substantial evidence was not presented that the actual

hardware and circuitry of the prior art VDM System was, as constructed, capable of

meeting the high frequency band limitation.  First, trial record does not support

EarthLink's contention that Williams actually tested the VDM System above 250 kHz

with the same hardware.  The court agrees with Inline that the corresponding testimony

cited by EarthLink "merely establish[es] that Mr. Williams was aware of the inverse

relationship between transmission distance and signal frequencies, and that he made

measurements using wire spools to confirm this principle."  Although Williams testified,

for instance, that he would not have to change the low and high-pass filters of the VDM

System in connection with higher frequency transmission, he testified that in order to

---

[33] Emphasis added.
[34] D.I. 649 at 104:15-25 (Williams direct – "Q.  Now, if you had wanted to operate at other frequencies, would you have had to effectively redo the system?  A.  No, it would not.  It would not be a back to the drawing board type of thing.  It would mean *changes to the components, actually, inside of this unit or these units.*  Q. Which unit?  A.  Yes.  There [are] some adjustable parts where you could adjust frequencies over certain range.  You may have to change some resistive values, capacitive values but technology was there with regard to other frequencies.") (emphasis added).
[35] Emphasis added.

transmit at the higher frequencies required by the claims-at-issue, he would have to *change components* of the VDM System (such as the values of resisters or capacitors in the unit), not just *simply adjusting settings*.[36]   The failure of the VDM System, as constructed, to be capable of transmitting at frequency-levels required by the high frequency band limitation means that the VDM System does not anticipate the claims-at-issue.[37]   The fact that replacing components might have an obvious solution which would have met that limitation is also not sufficient to demonstrate anticipation.[38]

---

[36] *See also* D.I. 649 at 161:12-162:4 (Williams recross – "Q.  All right.  Now, you opened up that modem and you said that some of the components could be adjusted; correct?  A.  Yes.  Q.  *But some of them you would have to replace?*  A.  *Yes. . . . .*  Q.  So it's not a matter of taking a screwdriver and making a few adjustments.  It's a matter of, for example, replacing capacitors?  A.  It depends.  But if you want me to make a minor frequency adjustment, I might be able to.  Let's say if I double the frequency or triple it, I might have to change components.  Q.  If you had to go to 250 kilohertz?  A.  Possibly.  Again, I don't have the schematic.") (emphasis added); *id.* at 107:24-108:10 (Williams cross – "Q.  I want to be clear about this frequency.  This VDM worked at 50 and 100 kilohertz; correct?  A.  Yes.  Q.  It never worked higher than that, did it, sir?  A.  It was never adjusted to work higher than that, once the product was developed.  Q.  It never worked higher than that, did it?  A.  It never worked higher than that.  Q.  And it was never adjusted higher than that, was it? . . . A.  No, it was not."); D.I. 654 at 167:5-12 (Waring cross – "Q.  They all require transmitting the data at frequencies higher than 250 kilohertz?  A.  Yes.  Q.  And the VDM system that we saw in the courtroom, those modules, never transmitted the data at more than 250 kilohertz, did it?  A.  It's my understanding that the system that was put into production and used in the field never went above 250.").

[37] *See, e.g., Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 738-40 (Fed. Cir. 2002) (The Federal Circuit reversed the trial court's denial of JMOL motion on anticipation because, *inter alia*, "the record lacks substantial evidence regarding at least one limitation of asserted claim. . . .  While the record contains testimony from several witnesses which, if believed by the jury, indicates that some of the claim limitations were found in the 1983 and 1988 dispensers, the record is devoid of evidence showing that the above [recited] limitations were found in either dispenser."); *Key Pharmas. v. Hercon Labs. Corp.*, 161 F.3d 709, 718-19 (Fed. Cir. 1998) (affirming trial court's determination that reference did not anticipate and rejecting argument that a particular example which delivered 2.0 mg/day "would merely have to be increased in size by 25 percent to deliver 2.5 mg/day . . . [as] lack[ing] the kind of support in the record needed for proof of invalidity by clear and convincing evidence").

[38] *See Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) ("The [trial court's] opinion says anticipation may be shown by less than 'complete anticipation' if one of ordinary skill may in reliance on the prior art 'complete the work required for the invention', and that "it is sufficient for an anticipation 'if the general aspects are the same and the differences in minor matters is only such as would suggest itself to one of ordinary skill in the art.'"  Those statements relate to obviousness, not anticipation.  Anticipation requires the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim.  A prior art disclosure that 'almost' meets that standard may render the claim invalid under § 103; it does not 'anticipate.'") (citation omitted); *see also Structural Rubber Prods. co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984) (rejecting anticipation argument "that missing elements may be supplied by the knowledge of one skilled in the art or the disclosure of another reference" and stating that "Park's arguments can not substitute for the absence of evidence of an anticipatory reference").

Consequently, the court grants Inline's JMOL that the VDM System does not anticipate any of the claims-at-issue.

Inline also argues that each of the anticipatory references, including the VDM System, cannot invalidate the claims because signals from the "external source of information" flow to or through the "telephone exchange" in those references.[39]   The court construed "telephone exchange" as "a switching center for connecting and switching phone lines."[40]   Inline states that the court construed the phrase "signal interface," but does not quote the court's claim construction,[41] rather, it discusses reasoning contained in the court's claim construction order concerning that term.   With reference to that reasoning, Inline argues (for instance, with respect to the VDM reference) that a demonstrative exhibit illustrates T1 lines directly connected to the telephone exchange, the VDM system allows data signals on the T1 lines to flow back and reach the telephone exchange.[42]

EarthLink argues strenuously that Inline is improperly making a new post-trial argument with its position that the claims do not allow any signals emanating from the "external source of information" to pass through the "telephone exchange" (i.e., the

---

[39] Inline presented arguments on this issue under both the court's construction and its own proposed constructions that the court rejected in its claim construction order.   Inline presented its non-anticipation argument under its own proposed constructions, as well as under the court's constructions, to preserve all of its rights on appeal.

[40] *Inline Connection Corp. v. AOL Time Warner Inc.*, 302 F. Supp. 2d 307, 329 (D. Del. 2004).

[41] The court construed the "signal interface" as "a device interposed on the opposite end (i.e., the local side) of the public trunk line (as defined by the inventor in the patent) from the telephone exchange that performs the recited functions of the incorporated circuitry."   *Id.*

[42] Inline makes similar arguments with respect to the Bellcore RFI ("the signals from the 'external source of information' . . . necessarily pass through (or to) the 'telephone exchange'"); the Waring article ("the source's data signals reach the ADSL unit only by passing through and exchange's conventional telephonic switch"); and Ithell & Jones ("its system allows the signals from the "external source of information' to flow to or through the 'telephone exchange'").

16

Central Office, or "CO").  EarthLink states that:

> The price for this new argument is that there never should have been a
> trial in the first place.  Industry standard ADSL in all instances passes
> Internet data through an ATM switch located in the CO (the accused
> "telephone exchange"); in other words, industry standard ADSL (including
> all instances of ADSL configured with DSLAMs in RTs) always passes
> signals emanating from the "external source of information" through the
> CO [on their way to the RT DSLAM and then on to the user's modem.]

EarthLink argues that no claim element explicitly prohibits "signals from the

'external source of information' from flowing to or through the 'the telephone exchange'";

that Inline never asked the court to construe (and the court did not construe) any claim

element as prohibiting "signals from the 'external source of information' from flowing to

or through the 'telephone exchange,'" and that Inline did not ask for (and did not

receive) any jury instruction which would have captured this broad concept.  EarthLink

notes that, Inline's brief neither identifies exactly which claim terms it believes are

missing from the anticipatory references, nor does Inline quote a phrase from any claim

element, nor any claim construction provided by the court.  Consequently, EarthLink

maintains that Inline does not rely on anything that was actually presented to the jury or

to the court.

EarthLink insists that the proper time and place for these arguments would have

been during claim construction, not during JMOL practice.  EarthLink concludes that

since Inline's arguments were before the jury, and they were not part of the jury

instructions, they have been waived.

EarthLink also states that Inline's position is inconsistent with positions it has

taken throughout this litigation.  In its most recent infringement contention interrogatory

responses–well after the January 2004 *Markman* Order on which Inline now

relies–Inline asserted that the claims would be met where a "DSL interface" is "connected to the external source of information, *e.g.*, world wide web, Internet, data center, ATM cloud, etc."[43]  EarthLink states that Inline never modified its infringement contentions to reflect a prohibition that external source signals cannot flow through or to a Central Office.  EarthLink further notes that Inline's invalidity expert, Beckmann, did not raise this argument in either of his two expert reports, on either of his two deposition days, or during either day of his trial testimony.  Moreover, EarthLink contends that Inline's expert, Dr. Charles Jackson, admitted at trial that ADSL works in the very manner that Inline now says is prohibited, *i.e.*, it sends Internet signals (data from the "external source of information") to and through the Central Office (the "telephone exchange):

> Q.  Okay.  Now, with the T1 line or with the fiber, the signal that is being sent out of the remote terminal is certainly above 250 kilohertz, isn't it?
>
> A.  Which signal?
>
> Q.  The signal that is carrying the Internet information.  Stuff that came out of the DSLAM that is now heading back toward the central office, that is above 250 kilohertz; right?
>
> A.  Well, yes, it's light.  The frequency associated with light, I can't remember what they are.
>
> Q.  Whatever it is, it's way above 250 kilohertz?
>
> A.  Sure.
>
> Q.  So the remote terminal is intentionally sending to the telephone exchange a signal above 250 kilohertz; correct?

---

[43] D.I. 688,  Ex. 17 (Plaintiff Inline Connection Corporation's Amended and Supplemental Answers to Defendant EarthLink, Inc.'s Interrogatories (Nos. 1-21)) at pp. 4-12.

A. Yes.[44]

EarthLink also cites the summary judgment declaration of Albert Whited which

confirmed that all RT DSLAMs pass Internet signals to and from the ATM switch in the

CO, which then pass them to and from the Internet through the ATM network.[45]

EarthLink continues by noting that:

> at no time prior to or during trial did Inline ever state, offer to stipulate, or explain to the court, the jury, or EarthLink that the claims prohibit the sending of Internet information from the RT DSLAM back through the telephone exchange (the CO) to the external source of information.

EarthLink concludes by stating that had it been aware of Inline's current

argument, EarthLink would have analyzed it and might have modified its trial strategy to

include, among other things, making obviousness contentions to overcome that

argument.

Inline responds by repeating its argument based on the court's explanation in its

claim construction order concerning the meaning of "signal interface."  The court notes

that significantly, however, the jury was not aware of the reasoning behind the

constructions of claims terms provided to them.  In arguing that EarthLink should not

have been surprised by Inline's current position, it points to, *inter alia*, Inline's proposed

claim constructions, and arguments by EarthLink during claim construction briefing and

---

[44] D.I. 649 at 180:13-181:3 (Jackson cross).  EarthLink responds to Inline's reply distinguishing Jackson's testimony  as relating to light signals traveling along fiber optic cables by stating that "all parties agreed that, in ADSL, the 'external source's data signal' (i.e., the Internet information) goes both 'to and 'through' the central office, regardless of whether it travels as a fiber optic light signal or as something else."

[45] EarthLink states that it cited Whited's report "to make plain that our expert and Dr. Jackson were in complete agreement that, in ADSL, the external data signals 'pass to,' 'pass through,' and 'pass to and through' the 'telephone exchange,' as 'telephone exchange' had been construed for purposes of this case, and this agreement would have made infringement impossible under Inline's 'data to or through' claim interpretation."

on summary judgment.  The court is not persuaded by Inline's arguments and agrees

with EarthLink that the present position set forth by Inline–that the court's claims

construction order "necessarily precluded the external source's data signals from

reaching the telephone exchange"–was not a theory appropriately presented at trial.

Accordingly, the court declines to consider this argument by Inline in its JMOL motion

with regard to any of the purportedly invalidating prior art.[46]

### 2.    The Bellcore RFI

Inline contends that EarthLink failed to satisfy its burden of proof that the Bellcore

RFI anticipates all of the asserted claims because (1) EarthLink's expert, Waring, only a

provided generalized and conclusory opinion; and (2) the reference fails to disclose key

limitations of the claims.  With regard to the specific limitations, Inline maintains that the

Bellcore RFI does not disclose (a) the low-pass filter connected to the telephone in a

splitterless configuration; (b) the RJ-11 jack in the configuration disclosed by claim 9 of

the '585 patent; and (c) the specific low-pass filter required by claim 4 of the '585 patent.

---

[46] *See Bettes v. Stonewall Ins. Co.*, 480 F.2d 92, 94 (5th Cir. 1973) ("[A] litigant cannot strategically
lie behind the log until after the trial and receipt of evidence, argument, and charge to the jury before raising
an issue not found in the pleadings nor included in the pre-trial order and then raise it when it is too late for
his opponent to do anything about it. The manifest prejudice of such tactics would make a shambles of the
efficacy of pre-trial orders and a fair trial."); *Violette v. Smith & Nephew Dyonics, Inc.*, 62 F.3d 8, 10-11 (1st
Cir. 1995) ("Other than asserting federal preemption in its answer, Dyonics never mentioned it again either
before or during the trial. It surfaced as an allegedly viable issue only after the jury returned its verdict. . . .
Regardless of its potential applicability, and we express no opinion on the subject, Dyonics has waived the
preemption issue by raising it substantively for the first time after trial. . . . In *Sweeney* [*v. Westvaco Co.*, 926
F.2d 29, 36-41 (1st Cir. 1991)], we held that the defendant waived its preemption defense by waiting to raise
it until after the jury had returned an adverse verdict.  Westvaco's failure to 'alert the court to the problem' at
any one of myriad opportunities prior to the jury verdict led us to decline to consider the defense."); *see also
Finnigan Corp. v. Int'l Trade Com'n*, 180 F.3d 1354, 1363 (Fed. Cir. 1999) ("A party's argument should not be
a moving target.  The argument at the trial and appellate level should be consistent, thereby ensuring a clear
presentation of the issue to be resolved, an adequate opportunity for response and evidentiary development
by the opposing party, and a record reviewable by the appellate court that is properly crystallized around and
responsive to the asserted argument.").  The court also declines EarthLink's request for attorneys' fees based
on this argument by Inline.

Inline's first argument is that Waring failed to provide an element-by-element analysis of the Bellcore RFI and how each claim element was disclosed in that reference.  Inline states that Waring only argued that, if the accused systems infringe, then the Bellcore RFI must anticipate the claims.[47]  In support of its argument that Waring failed to present clear and convincing evidence of anticipation, Inline cites the Federal Circuit's statement that :

> Typically, *testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference*. The testimony is insufficient if it is merely conclusory.  *General and conclusory testimony*, such as that provided by Dr. Kazmer in this case, *does not suffice as substantial evidence of invalidity*.  This is so even when the reference has been submitted into evidence before the jury.[48]

Inline contends that *Koito* presents a factually analogous situation to this case. There, the defendant argued "that, if the jury found that Koito's lenses infringed, then the '268 patent was invalid because of anticipation by prior art taillight that used the

---

[47] D.I. 649 at 237:20-238:1 (Waring direct – "Q.  And so the bottom line with respect to Defendant's Exhibit 6 is that *if industry standard ADSL were found to infringe, then the patent claims that are at issue would have to be invalid because the Bellcore RFI describes industry standard ADSL*.  A.  *Right*, I believe that is called 'anticipation' in legal terms.") (emphasis added); *see also it.* at 236:11-237:19 (Waring direct – "A.  you understand that Dr. Jackson has testified that industry standard ADSL infringes all 11 claims of the asserted patents?  A.  Yes, I understand that.  Q.  Okay.  You're not here to offer opinions on infringement; right?  A. No, I'm not.  Q.  Right.  And we have another expert that is going to do that; is that right?  A.  Right.  Q.  At least, you think that is right?  A.  Yes, I believe.  Q.  And what we have done is we have asked you for purposes of your analysis is to assume that Dr. Jackson is right, industry standard ADSL meets the limitations of the claim.  A.  Right.  When I did my analysis, I was asked to do a couple things.  I was asked to use the Court's construction of the claim terms and I was also asked to assume that these infringement allegations are correct.  Q.  Okay.  A.  That's my starting point for my analysis.  Q.  Okay.  And so if – I hope it doesn't happen but if the jury were to decide that in fact industry standard ADSL does infringe these claims, how does that impact your analysis with respect to invalidity based on the Bellcore RFI and the Valenti reference, Defendant's Exhibit 7?  A.  Since these documents represent what has become standard ADSL, and since these documents occur before Mr. Goodman'[s] patent in time, then these would invalidate the patent.  Q. a you-can't-have-your-cake-and-eat-it-too type analysis?  A.  The way I see it is it is one way or the other.").

[48] *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) (citations omitted) (emphasis added).

same method as that used by Koito."[49]   The *Koito* jury returned a verdict of non-

infringement and anticipation, as did the jury in this case.   On appeal, the Federal

Circuit "reject[ed] Koito's evidence of anticipation with respect to the prior art automobile

lenses" and stated that "[b]ecause the jury found Koito's lenses to not infringe the '268

patent and also that the '268 patent was invalid, the only consistent way to interpret the

jury's verdict is to determine that the jury did not find the prior art taillights to anticipate

the '268 patent."[50]   The Federal Circuit also stated that "this court has made clear that

there is no 'practicing the prior art' defense to literal infringement."[51]

Inline contends that in light of the similarity of the arguments and facts between

this case and *Koito*, that decision compels a grant of JMOL of non-anticipation as to the

Bellcore RFI.

EarthLink argues that *Koito* does not mandate "that the accused infringer must

proffer an expert who mechanically matches every word in a claim with a specific word

or disclosure in a prior art reference" and differentiates the evidence presented in this

case from that considered in *Koito*.   There, the Federal Circuit stated that "[b]ecause

Koito merely entered the JP '082 reference into evidence and provided no specific

testimony relating to it whatsoever, we hold that Koito did not present substantial

evidence with respect to JP '082 to support the jury's finding of anticipation and

obviousness."[52]   "Koito needed some explanatory testimony or other evidence to

---

[49] *Id.* at 1152.
[50] *Id.* at 1153.
[51] *Id.*
[52] *Id.* at 1145; *id.* at 1151 ("At trial, Koito entered the JP '082 reference into evidence, but otherwise failed to provide any testimony or other evidence that would demonstrate to the jury how that reference met the limitations of the claims in the '268 patent or how the reference enabled one of ordinary skill in the art to practice the claimed invention."); *id.* ("Koito did not even mention the JP ' 082 reference after introducing it into

compare JP '082 with the patent at issue . . . ."[53]

EarthLink does not argue that Waring provided testimony identifying each claim element and how each element was disclosed in the Bellcore RFI, but contends that *Koito* does not *require* such element-by-element testimony.  EarthLink notes that, in *Koito*, there was "no specific testimony . . . whatsoever" concerning the prior art reference, which was entered into evidence, and "not even mention[ed]" thereafter. Here, EarthLink states that there was significantly more than "some explanatory testimony or other evidence" concerning the Bellcore RFI.  Specifically, that Waring's direct testimony concerning that reference spans a dozen pages of the trial transcript.[54] Additionally, EarthLink argues that the jury could have concluded that Beckmann admitted that the Bellcore RFI anticipated the claims at issue with the exception of its purported failure to show distributed filtering with low pass filters.

> Q.  Now, do you agree with Mr. Waring that the Bellcore RFI anticipates all of the 11 claims that Inline asserts that EarthLink has infringed in this case?
>
> A.  No, I don't agree with that.
>
> Q.  Why not?
>
> A.  Two major factors are, first, the focus of this RFI is on what we have been calling the splitter ADSL architecture.  And then, secondly, in my opinion, there is no identification, no disclosure of low pass filters being used separate from the transceiver unit.[55]

---

evidence.").

    [53] *Id.* at 1152 n.4 (emphasis added).

    [54] EarthLink states that "Waring gave over a dozen pages of testimony about the Bellcore RFI, its disclosures regarding filtering, the hardware involved for transmission, the relationship with and treatment of POTS, and all of the other elements that all parties agreed constituted the 'building blocks' of the Patents-in-Suit." (citing D.I. 649 at 219:20-225:24, 231:23-238:1 (Waring direct)).

    [55] D.I. 654 at 226:4-13 (Beckmann direct).

EarthLink then cites testimony concerning those two issues which it frames as a dispute between the parties' experts concerning certain portions of the Bellcore RFI and that the jury evidently believed EarthLink's expert.

Finally, EarthLink argues the *Koito* has no application where the evidence shows that the prior art reference is materially identical to the accused device and states that "practicing the prior art" is available as an invalidity defense when the prior art and the accused technology are, in all pertinent respects, the same.  EarthLink maintains that the Federal Circuit has repeatedly ruled that when the defendant alleges that the prior art is the same as the accused technology, the defendant need only prove that the prior art reference is materially identical to the accused device to prove invalidity.  In support of that contention, EarthLink cites *Evans Cooling Sys., Inc. v. Gen Motors Corp.*,[56] *Bennett Regulator Guards, Inc. v. Canadian Meter Co.*,[57] *Vanmoor v. Wal-Mart Stores, Inc.*,[58] and *Benedict v. Gen. Motors Corp.*[59]

Inline first responds that *Koito* is not limited to situations where explanatory testimony is completely absent, as suggested by EarthLink, and that other courts have not so limited that case.[60]  With respect to its argument that EarthLink is improperly

---

[56] 125 F.3d 1448, 1451 (Fed. Cir. 1997).
[57] 184 Fed. Appx. 977, 978 n.1 (Fed. Cir. 2006) (non-precedential).
[58] 201 F.3d 1363, 1366 (Fed. Cir. 2000).
[59] 184 F. Supp. 2d 1197, 1200 (N.D. Fla. 2002).
[60] *See, e.g., Freeman v. Gerber Prods., Co.*, 506 F. Supp. 2d 529, 539 (D. Kan.  2007) ("Although Mr. Mueller offered testimony that claim limitations 7(e) and 7(f) were found in Venable, he did not address each of the subparts of those claim limitations-most notably, two of the subparts emphasized by plaintiffs."); *Black & Decker Inc. v. Robert Bosch Tool Corp.*, 476 F. Supp. 2d 887, 894-95 (N.D. Ill. 2007) (granting JMOL overturning jury finding of anticipation because, *inter alia*, "Dr. Horowitz did not identify each element of claims 2 and 10 of the '925 patent and explain how the Manpack Article or the Manpack Radio disclosed each claim element"); *Mangosoft, Inc. v. Oracle Corp.*, 421 F. Supp. 2d 392, 403 (D.N.H. 2006) (applying *Koito* in denying invalidity summary judgment motion and stating:  "Oracle's arguments and supporting exhibits are insufficient to show that the Kronenberg article anticipates.  Oracle's argument is based entirely on conclusory statements that an element is disclosed, supported only by ambiguous quotes from the reference. . . .  The conclusory

presenting a "practicing the prior art" defense, Inline cites The Federal Circuit's statement in *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.* that:

> [A]ccused infringers are not free to flout the requirement of proving invalidity by clear and convincing evidence by asserting a "practicing prior art" defense to literal infringement under the less stringent preponderance of the evidence standard. . . . [I]t is the presence of the prior art and its relationship to the claim language that matters for invalidity.[61]

Inline also correctly points out that the cases cited by EarthLink (*Evans Cooling*, *Bennett Regulator*, *Vanmoor*, and *Benedict*) represent a situation distinct from the facts of this case: when there is no dispute that the accused infringing product was identical to the prior art.[62] Those cases do not support EarthLink's position that they stand for the proposition that "when the *defendant* alleges that the prior art is the same as the accused technology, the defendant need only prove that the prior art reference is *materially identical* to the accused device to prove invalidity." There was no dispute in those cases that the accused product was identical to the prior art because the prior art *was* the products those plaintiffs accused of infringement.[63]

---

statement and references to the article are not supported by expert testimony explaining the correlation between the article and elements of claim 1 of the '377 patent.").

[61] 279 F.3d 1357, 1367 (Fed. Cir. 2002).

[62] *Bennett*, 184 Fed. App. at 978 n.1 ("*absent a dispute* as to whether the complete Splash Guard device was involved in the anticipatory act") (emphasis added).

[63] In *Evans Cooling*, Evans filed suit alleging infringement by GM with its manufacture and sale of cars having GM's "LT1" engine and GM asserted invalidity because it had placed the patented invention on sale prior to the critical date of the patent-at-issue. 125 F.3d at 1450. Defendant was thus able to meet its burden of proving the LT1 engine embodied the patented invention by plaintiff's allegation that the LT1 engine infringed. *Id.* at 1451.

In *Bennett*, Bennet Regulator Guards, Inc. sued American Meter Co. alleging that its Splash Guard infringed the patent-in-suit. 184 Fed. Appx. at 997. Meter defended by contending that it already had developed and publicized the Splash Guard prior to Bennett's efforts to obtain a patent and that these acts invalidated the '029 patent by anticipation under 35 U.S.C. § 102(a) and (b). *Id.* Although the Federal Circuit determined that genuine issues of material fact and vacated the district court's grant of summary judgment, *id.* at 977, it "agree[d] with the district court '[w]hen the anticipatory reference is the accused product, the Defendant's burden [of showing that the anticipatory reference contains each and every claim element] is satisfied by the Plaintiff's infringement allegations in the Complaint that the accused product embodies the claimed invention.'" *Id.* at 978 n.1 (second alteration in original).

Here, EarthLink's own accused ADSL system is not purported to be the anticipating reference.  Rather, EarthLink presents prior art documents describing ADSL and contends that its ADSL system is "materially identical" and, thus, "if [EarthLink's] industry standard ADSL were found to infringe, then the patent claims that are at issue would have to be invalid because the Bellcore RFI describes industry standard ADSL."[64] That testimony indicates that EarthLink is improperly relying on a "practicing the prior art" to establish invalidity where its ADSL system is not, itself, the prior art and Inline states that it "vigorously contends that the accused product is *not* the same as the prior art."  Also, the court's review of Waring's testimony is not sufficient to show that he "identif[ied] each claim element, state[d] [his] interpretation of the claim element, and explain[ed] in detail how each claim element is disclosed in the [Bellcore RFI]."[65]

Consequently, the court grants Inline's JMOL that the Bellcore RFI does not anticipate the claims-at-issue.[66]

---

In *Vanmoor*, the plaintiff sued Wal-Mart alleging infringement of its patent directed at a caulking gun cartridge. 201 F.3d at 1364.  Wal-Mart argued that "certain of the accused caulking cartridges were identical to cartridges manufactured, sold, and used prior to the critical date for the '331 patent." *Id.* at 1365.  The Federal Circuit stated that "[a]s was the case in *Evans Cooling*, the entire basis of the patent infringement claim is Vanmoor's (*the patentee's*) contention that the accused cartridges infringe the '331 patent." *Id.* at 1366 (emphasis added).  "Although Wal-Mart . . . bore the burden of proving that *the cartridges that were the subject of the pre-critical date sales* anticipated the '331 patent, that burden was satisfied by Vanmoor's allegation that *the accused cartridges* infringe the '331 patent." *Id.* (emphasis added).

In *Benedict*, the plaintiff's sued GM for infringement of his patent for an automated daytime running light system for cars and trucks. 184 F. Supp. 2d at 1198-99.  The court found that the record established that GM's automated daytime running light system was completed prior to the plaintiff's invention and, thus, GM, rather than plaintiff, was the first inventor of the system. *Id.* at 1199-1200.  Citing *Evans Cooling* and *Vanmoor*, the court stated that those cases "establish that when *a patent holder's entire claim is that an accused product infringes the patent*, then, for purposes of determining on motion for summary judgment whether the patent is invalid *because the accused product* was earlier-invented or earlier-on-sale, no further showing of identity of the patented and accused products is required." *Id.* at 1200 (emphasis added).

[64] D.I. 649 at 237:20-238:1 (Waring Direct); *id.* ("Right, I believe that is called 'anticipation' in legal terms.").

[65] *Koito*, 381 F.3d at 1152.

[66] In light of this determination, the court need not consider the parties' arguments directed at specific limitations purportedly missing from the Bellcore RFI.  The court also determines the Beckmann testimony cited by EarthLink is not an admission, that all but two of the claims-at-issue specific elements are adequately

### 3.    The Waring Article

Inline contends that EarthLink argued in its closing that the Waring Article anticipates the asserted claims, but that EarthLink's own expert never offered an invalidity opinion about his own paper.  Inline also argues that merely having the claimed elements present in a prior art reference is insufficient; rather, "these elements must be arranged as in the claim under review."[67]  Inline asserts that there was no such evidence from either side's expert.  Inline also states that EarthLink never presented any testimony to "identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference," as required by precedent in *Koito*.[68]  Lastly, Inline contends that there was no evidence that the Waring Article discloses either a filter that "reflects substantially all of the energy in the high frequency band" or an RJ-11 jack connected between a filter and a branch network as required by claims 4 and 9 of the '585 patent, respectively.

EarthLink maintains that there is no requirement that it use its own expert to put this prior art reference into evidence.  EarthLink states that in light of the admissions Beckmann made at his deposition, it made the strategic decision to present this paper through Inline's expert.[69]

EarthLink states that the Waring Article was presented to the jury through the following Beckmann testimony:

---

disclosed in the Bellcore RFI and, in any event, does not establish by clear and convincing evidence the presence of those elements and did not relieve EarthLink of its burden to prove that the reference discloses them.
[67] Citing *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).
[68] 381 F.3d at 1152.
[69] Citing *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1065 (Fed. Cir. 1998) (relying on trial admissions of opposing party to find patent invalid as a matter of law.).

Q.  Okay.  But you agree that the Waring paper disclosed an ADSL system; correct?  That's what you told Mr. Lewis yesterday; correct?

A.  Yes, that's correct.

Q.  And the Waring paper specifically discusses the need for multiple low-pass filters if you have multiple phones; correct?

A.  I believe that's correct; he has a discussion of that in a section of his paper.

Q.  And you agree that the Waring paper discloses the fact that if you have multiple telephones you need to put multiple low-pass filters in front of each phone; correct?

A.  I believe that's correct.  If you could possibly pull up those two paragraphs in the paper, we can look at them; I can speak more confidently about what we are talking about.

Q.  Okay.  Do you recall telling Mr. Gaudet during your deposition that in fact you agreed with the fact that the Waring paper discloses the need to put low-pass filters in front of each telephone?

A.  That seems reasonable.  Again, I don't recall precisely what I said there.[70]

EarthLink contends that, particularly when all inferences are resolved in its favor, Beckmann conceded that every limitation was present in the Waring Article.

Q.  And, Dr. Beckmann, at this page, Mr. Waring discusses multiple low-pass filters.  Do you see that in the second paragraph on this page?

A.  Yes.  I see where he is discussing use of small easily installed filters.

Q.  Filters, plural?

A.  Right.

Q.  And you would agree that you interpreted this discussion that if he had multiple telephones or a consumer had multiple telephones you needed multiple low-pass filters; right?

---

[70] D.I. 655 at 31:14-32:9 (Beckmann cross).

A.  I recall that discussion, I believe I indicated to Mr. Gaudet that I was just a little confused about the mention of multiple walled telephones in the kitchen, that created some confusion in my mind about where the plurality actually applied because people typically don't have multiple wall telephones in their kitchen, if you look across a lot of houses, and you can talk about multiple wall phones.  So that confused me a little bit as to how to apply the S on filters, whether that's talking about filters in a single home or filters in multiple homes.

Q.  But if you didn't have multiple wall telephones, if you just had an ordinary telephone sitting on the kitchen counter, you would put a filter in front of it; right?

A.  I would certainly do that today.  I was just trying to discuss this article as to what I could understand from the article.

Q.  All right.  Well, let's cut to the punch line, then.  You agree with respect to the '446 patent that the Waring paper discloses all of Claim 1; right?

A.  Again,  I would have to say the Waring article mentions most, if not all, of the elements of the claim.  I hesitate to use the word discloses since that seems to impart some special meaning in patent law that includes teaching or helping someone understand how to put the system together.

Q.  You would agree that the Waring paper mentions every single claim limitation of Claim 1 of the '446 patent; is that correct?

A.  I believe that that's correct.  I believe that the '446 is the one that uses the conductive path term.

Q.  And it has multiple telephones; right?

A.  Right.

Q.  And you did not offer an opinion during the course of your deposition with us that there was any claim element that was not mentioned in the Waring paper; right?

A.  I believe that's correct.

Q.  Okay.

A.  Yes.

Q.  And the same would be true with respect to Claim 1 of the '585 patent;

29

right?

A.  With respect to the Waring paper?

Q.  Yes.

A.  I believe it would also be the case that he mentioned –

Q.  Every claim element in the '585 patent; right?

A.  Right.  I believe that's true.

Q.  And he clearly mentioned every claim element of the '596; right?

A.  Yes.  Every claim element of the '596 is contained in the other.

Q.  Fine.  That's the easy one; right?

A.  It's the one with fewer conditions; right.

Q.  Right.  And you have not offered any opinions that the Waring paper fails to disclose any of the additional elements that are found in the dependent claims of either the '446 or the '585 patent; right?

A.  That's correct.  I did not refer to the Waring paper as not disclosing any – not mentioning anything in the dependent claims."[71]

EarthLink responds to Inline's statement that "EarthLink's own expert never offered and invalidity opinion about his own paper," as being irrelevant (since party admissions may suffice),[72] and incorrect.  Arguing that Waring's testimony was not necessary (in light of Beckmann's purported admissions), EarthLink nevertheless states that Waring offered the following testimony about the Waring Article:

Q.  This is the article that you wrote in December of 1991?

A.  Yes, it is.

---

[71] D.I. 655 at 32:25-35:21 (Beckmann cross).
[72] Citing *Nobelpharma*, 141  F.3d at 1065.

Q.  And as it says in the abstract, this paper provides an over view of the newly emerging asynchronous digital subscriber line.  And this is a summary you wrote for a technical audience about the thinking at Bellcore about ADSL at that point, was it not?

A.  Yes, it was for, an IEEE sponsored conference call.

Q.  And it summarized the Bellcore thinking about ADSL at that point?

A.  Yes, that is correct.

Q.  And in fact, you called it, you referred [to it] as the first published paper on ADSL, haven't you?

A.  I believe that to be the case, yes.

Q.  Okay.  And you put that in your resume, that it's the first published paper on ADSL?

A.  Yes, I'm not aware of any earlier paper.

Q.  And in your report in this case, this is the paper you argued had all the elements of the asserted claims just like Bellcore and Valenti?

A.  My first expert report?

Q.  Yes.

A.  Yes.[73]

EarthLink states that the other arguments made by Inline in its attempt to undo Beckmann's admissions were properly rejected by the jury.

In *Nobelpharma*, the case upon which EarthLink's argument primarily rests, the patent-at-issue was found to be invalid for failure to disclose the inventor's preferred mode of making the invention.  The patent claimed "'an element intended for implantation into bone tissue'" and recited that the element "preferably . . . [had] a

---

[73] D.I. 654 at 140:11-141:9 (Waring cross).

31

network of particularly-sized and particularly spaced 'micropits.'"[74]   The Federal Circuit

stated that, "[f]or whatever reason," as part of the patentee's case-in-chief it introduced

inventor testimony that:

> (1) "there were some minor details that were not included [in the patent]
> and which proved to be quite important," (2) other skilled artisans would
> have to be "lucky" to obtain a suitable micropitted implant "by cutting a
> piece of titanium at a speed less than twenty meters per minute," the
> cutting speed disclosed in the patent, and (3) "any of the small detailed
> recipes that I discussed but did not specify" in the patent "can cause you
> to fail to get micropitting even though you were cutting the metal at less
> than twenty meters per minute."[75]

The court noted that the record unambiguously indicated that when the inventor's patent

application was filed, he was aware that "a variety of undisclosed machining parameters

were critical to the production of a functional implant . . . [and that the inventor]

possessed a preferred mode of making the claimed implants" by the time the patent

application was filed.[76]   "Thus, the evidence at trial leads to only one reasonable

conclusion:  [the inventor] possessed a preferred method of making the claimed

invention and failed to disclose it sufficiently to enable those skilled in the art to practice

that method."[77]

The *Nobelpharma* court noted that "[n]ormally, evidence presented by a

patentee-plaintiff will not support a grant of a JMOL invalidating a patent.  That is

because the burden is on an accused infringer to show by clear and convincing

evidence facts supporting the conclusion that the patent is invalid."[78]   "[I]n unusual

---

[74] *Nobelpharma*, 141 F.3d at 1062.
[75] *Id.* at 1065 (alteration in original).
[76] *Id.*
[77] *Id.*
[78] *Id.*

cases, an admission by a plaintiff's witness can be sufficient to support entry of a JMOL in favor of a defendant after the close of the plaintiff's case-in-chief, even where the defendant bears the burden of proof on the decided issue."[79]  The court determined that the trial court had not drawn adverse inferences against the plaintiff to support its judgment; it relied on inventor-statements "'that the jury would not be at liberty to disbelieve'" and "did not place the burden of proving validity on [the plaintiff as the plaintiff's] own evidence was clear and convincing that the patent is invalid."[80]  Thus, the court concluded that *Nobelpharma* was "one of those 'extreme' cases in which it was not improper to grant JMOL in favor of a defendant on an issue regarding which it bore the burden of proof."[81]

Unlike *Nobelpharma*, this is not one of those "extreme" cases where EarthLink's reliance on testimony from the opposing party can sustain the jury's verdict on an issue it bore the burden of proof.  In *Nobelpharma*, the evidence that the inventor did not disclose the best mode of practicing his invention was indisputable.  Such is not the case here.  Beckmann's testimony only recites his general agreement that certain hardware is "mentioned" in the Waring Paper.  That testimony, however, does not provide clear and convincing evidence explaining how the hardware mentioned would demonstrate to one skilled in the art the connection between that article and the claims-at-issue.  Moreover, Waring's general testimony concerning his authorship of the reference, is clearly insufficient to support the jury's verdict, even when combined with

---

[79] *Id.*
[80] *Id.* (quoting *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir. 1984)).
[81] *Id.*

Beckmann's testimony and resolving all reasonable inferences in EarthLink's favor.

The court, therefore, grants Inline's JMOL motion that the Waring Article does not

invalidate the claims-at issue.

### 4. The Ithell & Jones reference

With this reference, Inline repeats its *Koito* argument that EarthLink's expert

failed to explain in detail how the Ithell & Jones article discloses each claimed limitation.

Inline also argues that Waring's testimony failed to explain how the reference discloses

the following elements of claim 61 of the '596 patent:

> "circuitry for receiving a plurality of external signals . . . ";
>
> "circuitry for transmitting to selected sets of one or more of the plurality of transceivers . . . "; and
>
> "a branch network which couples one of the plurality of telephone devices to the telephone exchange . . ."

Inline makes the same argument with regard to the following limitations in claims 1-5 of

the '446 patent:

> "circuitry for receiving an external signal encoding an information stream from the external source of information"; and
>
> "circuitry for transmitting over the telephone wiring network to the transceiver an internal signal in the high frequency band encoding the information stream."

With regard to claim 1 of the '585 patent, and its dependant claims, Inline states that

Waring did not explain the disclosure of:

> "a plurality of separate conductive paths, each coupling the signal interface and a different one of the plurality of transceivers . . .";
>
> "at  each of the residences at which one of the transceivers is located, a branch conductive path coupled at a location separated from said transceiver . . .";

34

"wherein each transceiver includes circuitry for communicating with the signal interface in a high frequency band of frequencies . . . ";

"circuitry for receiving a plurality of external signals encoding information streams from the external source of information . . ."; and

"circuitry for transmitting over the telephone wiring network to the transceivers a plurality of internal signals in the high frequency band . . ."

Additionally, Inline argues that the Ithell & Jones article fails to disclose low-pass filters separate from the transceiver's location as required by all of the asserted independent claims. Lastly, Inline argues that Ithell & Jones cannot anticipate claim 9 of the '585 patent because of its failure to disclose either an RJ-11 jack or its "coupl[ing] between one of the branch conductive paths and filter connected to said branch." Inline also maintains that because the Ithell & Jones article does not disclose low-pass filters separate from the transceiver's location, it cannot anticipate any of the asserted claims. Finally, Inline maintains that EarthLink failed to present any evidence that the Ithell & Jones article disclosed either the RJ-11 jack or its "coupl[ing] between one of the branch conductive paths and filter connected to said branch," as required by claim 9 of the '585 patent.

As a general matter, rather than improperly relying on a "practicing the prior art" argument, Waring's testimony attempted to match the elements of the claims-at-issue with the disclosures of the Ithell & Jones reference.[82] With regard to the "circuitry for

---

[82] *See, e.g.*, D.I. 654 at 57:2-80:12 (Waring direct). Specifically, *see* D.I. 654 at 57:2-60:15, 61:17-67:22 (discussing the publication/presentation date, focus, context, and audience of the reference, and proceeding to explain the information disclosed therein); D.I. 654 at 68:4-71:3 (describing how Waring interpreted the reference to teach the limitations of claim 61 of the '596 patent and that, in his opinion, the claim is anticipated by the Ithell and Jones reference); D.I. 654 at 71:4-74-6 (same regarding claim 1 of the '446 patent); D.I. 654 at 74:12-75:5 (same regarding claims 2 and 3 of the '446 patent); D.I. 654 at 75:7-21 (same regarding claim 4 of the '446 patent); D.I. 654 at 77:22-76:12 (same regarding claim 5 of the '446 patent); D.I. 654 at 76:13-77:13 (same regarding claim 1 of the '585 patent); D.I. 654 at 77:14-78:2 (same

35

receiving" claim elements, EarthLink contends that Waring explained in detail how figures 2 and 9 of the Ithell & Jones article discloses those elements by showing how multiple channels of data from an external source is multiplexed on an E1 line that is received by a signal interface placed in a cabinet.[83]   Concerning the "circuitry for transmitting" and "plurality of separate conductive paths . . . " claim elements, EarthLink states that Waring testified that, as reflected in figures 2 and 9 of the Ithell & Jones article, the signal interface would separate out the individual external data channels from the E1 line and would then place the data in a high frequency band above voice band on specific telephone lines leading out to the corresponding transceivers in the individual homes.[84]   With regard to the "branch network"/ branch path" claim elements, EarthLink states that Waring testified that, as shown in figures 2 and 9 and as reflected on page F5.5 of DX-14, the system proposed by Ithell & Jones would operate over the ordinary telephone network, reaching from the telephone exchange to the individual homes, and that the article provided for separate low-pass filters before every telephone device on every branch extension within a home.[85]   Finally, concerning the "circuitry for communicating" element, EarthLink states that Waring testified that the transceivers in the homes shown in figures 2 and 9 of the Ithell & Jones article had high-pass filters before them that would block voice-band signals, but would allow the transceivers to

---

regarding claim 2 of the '585 patent); D.I. 654 at 78:3-21 (same regarding claim 4 of the '585 patent); D.I. 654 at 78:22-79:17 (same re claim 8 of the '585 patent); D.I. 654 at 79:18-80:12 (testifying that reference does not recite an RJ-11 jack as required by claim 9 of the '585 patent, but that, in his opinion, one of skill in the art reading this document from the U.K. would know to use an RJ-11 jack if they were going to build the system for use in the United States).

[83] Citing D.I. 65:4 at 64:8-65:7: 68:7-69:6; 75:11-17: 77:18-24; 79:1-14: 144:23-145:5; 146:18-147:16.

[84] Citing D.I. 65:4 at 64:8-66:21; 67:2-18; 68:7-69:6; 74:16-75:1; 75:11-17; 77:18-24; 79:1-14; 145:23-146:10; 146:18-147:13.

[85] Citing D.I. 654 at 63:18-66:21; 69:23-70:15; 71:19-72:12; 145:23-146:10.

communicate with the signal interface in the cabinet in the high frequency band.[86]

Ultimately, the court agrees with Inline that the record evidence cited by EarthLink opposing Inline's JMOL motion is insufficient to establish that all of the elements of the claims at issue are disclosed in the Ithell & Jones reference. At least with regard to the "circuitry for receiving" and "circuitry for transmitting" elements, required by all three patents, the testimony relied upon by EarthLink is either general testimony giving Waring's overview of the system described in the reference and not related to a particular claim and/or testimony not sufficiently on point for the particular claim element. Because the court determines that Waring's testimony was insufficient to "explain in detail how each claim element is disclosed in the [Ithell & Jones] reference,"[87] that testimony cannot provide clear and convincing evidence of anticipation. In light of this determination, the court need not consider the parties' additional arguments directed at other purportedly missing elements from this reference.

Consequently, the court grants Inline's JMOL motion that the Ithell & Jones reference does not anticipate the claims-at-issue.

B.   Obviousness

The jury instructions set forth only one basis for finding the asserted claims invalid for obviousness:  the combination of the Bellcore RFI and the Valenti Article. Inline contends that the record does not contain substantial evidence that the combination of the Bellcore RFI and Valenti Article could invalidate the asserted

---

[86] Citing D.I. 654 at 65:24-66:21; 67:2-22; 68:15-69:6; 77:18-24.
[87] *Koito*, 381 F.3d at 1152.

claims.[88]  Moreover, Inline maintains that there was no testimony from EarthLink's

expert on this combination.  Although Waring gave testimony related to the Bellcore RFI

and the Valenti Article, Inline insists that Waring did not offer testimony about what their

combination would teach, or how the combination would disclose to a skilled artisan

every limitation of the asserted claims.  Consequently, Inline argues that the jury had no

factual basis on which to conclude that any asserted claim was obvious to a person of

ordinary skill in the art at the time of the invention.  Having purportedly failed to present

evidence on this issue, where EarthLink bore the burden of proof, Inline maintains that

judgment as a matter of law in Inline's favor is compelled.

Additionally, Inline maintains that the evidence at trial establishes that the alleged

combination of the Bellcore RFI and Valenti Article would not provide the necessary

expectation of success for a finding of obviousness.  Inline states that Beckmann's

testimony on the issue was uncontroverted and precludes the obviousness finding as a

matter of law.[89]  Moreover, Inline contends that although Waring discussed the Valenti

article and the Bellcore RFI in relation to the accused ADSL system, it did not compare

the references to, or show how they disclose, the asserted claims.

Lastly, Inline contends that Beckmann's testimony demonstrated that all

secondary considerations (long-felt, but unmet, need; licensing of the patents;

commercial success; and praise of the inventions) considered at trial compel a

---

[88] *See* Jury Instructions at 4.3.1 ("EarthLink contends that the claims are obvious in light of the combination of the following prior art:  Bell Communications Research (Bellcore), Request for Information: Asymmetric Digital Subscriber Line (ADSL) Systems that Support Simplex High-Bit-Rate Access and POTS in the Copper Loop Plant; and Craig Valenti, Technical Feasibility Issues for ADSL, Combined with the knowledge of one of ordinary skill in the art.").
[89] Citing D.I. 655 at 78:23-79:14 (Beckmann redirect).

conclusion of nonobviousness.  Inline maintains that EarthLink did not offer adequate

evidence to rebut these secondary considerations and that those objective indicia,

therefore, reinforce the evidence of nonobviousness.

Based on the above, Inline maintains that no reasonable jury could have found

that EarthLink proved by clear and convincing evidence that any asserted claim is

obvious in light of the combination of the Bellcore RFI and the Valenti Article and the

court should grant JMOL on this issue.

EarthLink argues that Inline does not suggest that there are any missing or non-

obvious claim elements and that, in light of the Supreme Court's decision in *KSR Int'l*

*Co. v. TeleFlex, Inc.*,[90] and the Federal Circuit's decision in *Leapfrog Enters., Inc. v.*

*Fisher-Price, Inc.*,[91] the jury's decision on obviousness must stand.  In response to

Inline's argument that Waring did not testify about what the combination would teach,

EarthLink cites *Leapfrog* and the Federal Circuit's caution against formulaic approaches

to obviousness:

> An obviousness determination is not the result of a rigid formula
> disassociated from the consideration of the facts of a case.  Indeed, the
> common sense of those skilled in the art demonstrates why some
> combinations would have been obvious where others would not.[92]

The court agrees with EarthLink that the evidence demonstrates that the Bellcore

RFI and the Valenti Article should be combined.  That evidence includes the testimony

of both Beckmann and Waring that both references were written by the same author

and both described ADSL:  Waring described Valenti as an "elaboration" of the Bellcore

---

[90] 127 S. Ct. 1727 (2007).
[91] 485 F.3d 1157 (Fed. Cir. 2007).
[92] *Leapfrog*, 485 F.3d at 1161.

39

RFI;[93] Beckmann referred to the Valenti paper as an "expansion" of the Bellcore RFI.[94]

The court determines, however, the record cannot support the jury's verdict on obviousness.  Unlike its attempt to demonstrate, albeit unsuccessfully in the court's view, the presence of each of the specific claim elements in the Ithell & Jones article, the court again concludes that EarthLink did not carry its burden of showing by clear and convincing evidence that the two references, combined with the knowledge of one skilled in the art, disclosed each limitation of each claim at issue.[95]  The court previously determined, with regard to EarthLink's argument that the Bellcore RFI anticipates, that EarthLink is improperly relying on a "practicing the prior art" to establish invalidity where its accused ADSL system is not, itself, the prior art.  As with the Bellcore RFI, Waring testified that the Valenti Article shows that if industry standard ADSL infringes, the patent claims must be invalid.[96]  Because the court determined that the cited testimony

[93] D.I. 654 at 180:3-8 (Waring stating that Beckmann described the Valenti paper as an expansion upon the Bellcore RFI); *id.* at 186:19-187:1 (Waring characterizing the Valenti paper as an "elaboration" of the Bellcore RFI).

[94] D.I. 654 at 274:25-275:6 (Beckmann testifying that the Valenti paper "expanded" on the Bellcore RFI in detailing "various filtered configurations").

[95] The *Leapfrog* opinion, upon which EarthLink relies, demonstrates that in that case evidence of each of the limitations of the claim-at-issue was present in the two prior art references, with the exception of one element which was well known in the art at the time of the invention.  *See Leapfrog*, 485 F.3d at 1160 ("Leapfrog argues that the district court engaged in improper hindsight in reaching its conclusion of obviousness *by concluding that all of the limitations of the claim are found in the prior art*.") (emphasis added); *id* at 1161 ("We agree with Fisher-Price that the district court correctly concluded that the subject matter of claim 25 of the '861 patent would have been obvious in view of the combination of Bevan, the SSR, and the knowledge of one of ordinary skill in the art."); *id.* (discussing the Bevan reference); *id.* at 1161-62 (discussing the SSR reference); *id.* at 1162 (agreeing with the district court that "one of ordinary skill in the art of children's learning toys would have found it obvious to combine the Bevan device with the SSR to update it using modern electronics components in order to gain the commonly understood benefits of such adaptation . . .") *id.* at 1162 (stating that the "combination of Bevan and the SSR *lacks only* the 'reader' of claim 25 of the '861 patent" and agreeing with the district court that there was ample evidence in the record "that readers were well-known in the art at the time of the invention").

[96] D.I. 649 at 237:20-238:4 (Waring direct – "Q.  And so the bottom line with respect to Defendant's Exhibit 6 is that if industry standard ADSL were found to infringe, the patent claims that are at issue would have to be invalid because the Bellcore RFI describes industry standard ADSL?  A.  right, I believe that is called 'anticipation' in legal terms.  Q.  Okay.  *And the same outcome with respect to Defendant's Exhibit 7, the Valenti reference?*  A.  *Yes*.") (emphasis added).  The court also again determines that the testimony of

concerning the Bellcore RFI was insufficient to demonstrate an element-by-element disclosure of the asserted claims, Waring's additional testimony concerning the Valenti Article concerning claim elements purportedly missing from the Bellcore RFI cannot sustain the jury verdict on obviousness.  Based on this determination, it is unnecessary to consider the parties' additional arguments concerning specific claim elements and testimony with regard to secondary considerations.

Consequently, the court grants Inline's motion for JMOL on the issue of obviousness.

C.    *Invalidity Under 35 U.S.C. § 112*

1.    Enablement

The enablement requirement set forth in 35 U.S.C. § 112, ¶ 1 provides, in pertinent part, that the specification shall describe "the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the [invention.]."  It is a legal determination of whether a patent enables one skilled in the art to make and use the claimed invention.  A specification is enabling even if some experimentation is required.  Whether a specification is enabling is a question of law:  however, "because a jury decided the issue here based on factual determinations," the court looks "to whether a reasonable jury could have made the underlying factual findings necessary to provide substantial evidence in support of its

_____

Beckmann EarthLink cites is insufficient to carry its burden on this issue.

41

conclusion."[97]

> There is no requirement that:
>
> a patent disclosure enable one of ordinary skill in the art to make and use a perfected, commercially viable embodiment absent a claim limitation to that effect. Title 35 requires only that the inventor enable one of skill in the art to make and use the full scope of the claimed invention.[98]

Also, while the full scope of the claimed invention must be enabled, the specification "need not enable anything broader than the scope of the claims."[99]  "'[A]n enablement determination is made retrospectively, *i.e.*, by looking back to the filing date of the patent application and determining whether undue experimentation would have been required to make and use the claimed invention at that time.'"[100]

Prior to trial, the court issued an order precluding EarthLink's invalidity expert, Waring, from testifying on the issue of enablement.[101]  Consequently, EarthLink primarily relies on the trial testimony of Inline's inventor, Goodman, as demonstrating lack of enablement as a result of undue experimentation.  Inline contends that there was no evidence presented at trial as to whether a hypothetical person of ordinary skill would have required undue experimentation to make the invention when the patent was

---

[97] *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1371-72 (Fed. Cir. 2003) (citations and internal quotation marks omitted).

[98] *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1338 (Fed. Cir. 2003); *see also Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1224 (Fed. Cir. 2006) ("In order to enable the claims of a patent pursuant to § 112, the patent specification must teach those of ordinary skill in the art 'how to make and use the full scope of the claimed invention without undue experimentation.'" (quoting *Bruning v. Hirose*, 161 F.3d 681, 686 (Fed. Cir.1998)).

[99] *Neutrino Dev. Corp. v. Sonosite, Inc.*, 410 F. Supp. 2d 529, 542 (S.D. Tex. 2006); *see also Nat'l Recovery Tech., Inc. v. Magnetic Sparation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed. Cir. 1999) ("The scope of the claims must be less than or equal to the scope of the enablement.").

[100] *Elan Pharms., Inc. v. Mayo Found. for Med. Educ. & Research*, 346 F.3d 1051, 1056-57 (Fed. Cir. 2003); *see also CFMT, Inc.*, 349 F.3d at 1339 (Enablement is gauged "at the date of filing, not in light of later developments.").

[101] *See* D.I. 613 at 8 (finding that Waring did not conduct a proper enablement analysis; rendering his enablement opinion unreliable and inadmissable).

filed.  Further, Inline contends that the testimony relied upon by EarthLink is insufficient to support the jury's verdict that the claims were not enabled by the patent specification under the clear and convincing standard required for invalidity.

With regard to the asserted claims of the '596 and '446 patents, EarthLink avers that "[i]t took Mr. Goodman *five years of work* to build a system that practiced any of the asserted claims of [those patents]."[102]  Goodman's trial testimony does not support that assertion.

> Q.   At the time you filed your 1991 application, you had never built any system that actually practices the asserted claims of the '596 and '446 patent[s]; correct?
>
> A.   I think that's correct.
>
> Q.   And it was not until sometime in 1996 that you were able to actually build a system that practice the claim[s] of the '596 and '446 patents; is that correct?
>
> A.   *Until 1996 I didn't have the funds to build a system to practice those patents.*
>
> Q.   1996 is the first time that you were able to build a system that practiced the claims of the patent[s]?
>
> A.   Yes.[103]

With regard to the asserted claims of the '585 patent, EarthLink contends Goodman testified that "he was *never able* to build a system that practiced the asserted claims [of that patent]."[104]  In fact, Goodman's testimony was that he "never tried" to transmit signals from a transceiver or signal interface over the last thousand feet of

---

[102] Emphasis added.
[103] D.I. 644 at 254:20-255:7 (Goodman cross) (emphasis added).
[104] Emphasis added.

43

telephone wire.

Q.  "A[s] of the time that we took your deposition in this lawsuit, you still had never built a system that practiced the '585 claims; correct?

A.  I think that's true, yes.

Q.  And funds weren't an issue; correct?  There was a period of time where funds weren't an issue?

A.  Funds weren't an issue, but business profit was.

* * * * *

Q.  [I]n connection with the 1991 patent specification that leads to the patents in suit here, the focus of the invention is really the transmission of signals from a transceiver or signal interface over the last thousand feet of telephone wire; correct?

A.  That's the emphasis of the patent, if you call it focus; I guess that's fair, too, sure.

* * * * *

Q.  [Y]ou stated in your patent specification that the transmission could occur over approximately the last thousand feet?

A.  Right.

Q.  That was just a theoretical projection at the time?

A  That was a theoretical projection, yes.

Q.  You had never been able to transmit distances . . . of one thousand feet; right?

A.  *I never tried.*[105]

EarthLink cites *Liebel-Flarsheim Co. v. Medrad, Inc.*[106] as support for its

argument that Goodman's testimony was sufficient to support the jury's verdict on

---

[105] D.I. 644 at 254:8-14; 256:4-10; 256:16-24 (Goodman cross) (emphasis added).
[106] 481 F.3d 1371 (Fed. Cir. 2007).

44

enablement.  That case presented substantially different facts than here.  In *Liebel-Flarsheim*, the Federal Circuit determined that the claimed invention covered both embodiments of a syringe with a pressure jacket and one without a pressure jacket.[107] The court then examined the specification and found that it taught away from a syringe without a pressure jacket.[108]  The court next considered the testimonial evidence and found that it "support[ed] a conclusion that no genuine issue of material fact exists as to whether undue experimentation would have been required to make and use the injector without a pressure jacket."[109]  Here, there is no similar evidence from the specification or testimony to support the jury's verdict on enablement.

First, the court notes that there was no testimony concerning the amount of experimentation required to practice the claimed inventions of the '596 and '446 patents at the time of their filing.  Second, contrary to EarthLink's assertion it took Goodman five years of work to build a system that practiced those claims, his testimony was that he did not have the funds to build such a system until 1996 and, when those funds were available, he built the claimed system that year.  With regard to the asserted claims of the '585 patent, the court finds incorrect EarthLink's characterization of Goodman's testimony as establishing he was *never able* to build a system that practiced the

---

[107] *Liebel-Flarsheim*, 481 F.3d at 1374-75.

[108] *Id.* at 1379 (noting that the specification stated that a disposable syringe without a pressure jacket was "impractical" and that the specification provided "no guidance or suggestion of how to make or use a disposable syringe for high pressure use without pressure jacket" and that each of the figures illustrated "a pressure jacket and all discussion of them refers to the pressure jacket").

[109] *Id.* at 1379 ("*The inventors admitted that they tried unsuccessfully* to produce a pressure-jacketless system and that producing such a system would have required more experimentation and testing. The inventors decided not to pursue such a system because it was 'too risky.'  The district court relied on various statements in the record by the inventors that *testing of a syringe without a pressure jacket proved unsuccessful and* that the inventors were *not aware of any other similar testing being conducted at that time.*") (emphasis added).

asserted claims.  Goodman testified that, although funds for building such a system were not an issue, business profits were.  Also, rather than testifying that he had not been *able* to transmit distances of one thousand feet, Goodman stated that he "never tried."[110]  The court concludes, therefore, that Goodman's testimony does not support the jury's verdict on enablement.

EarthLink also contends that the jury could reasonably have concluded that the specification teaches away from the distances encompassed by the full scope of the claims.[111]  EarthLink argues that the full scope of the claims, "and that the claim scope (*as seen by the accused system*) cover[s] hardware and frequency levels that transmit[] over telephone wires for multiple thousands of feet."[112]  EarthLink concludes that the specification must enable a system that can transmit up to 16,000 feet.

EarthLink's assertion that the patents must enable a system that can transmit up to 16,000 feet because that is the distance over which the *accused system* operates is flatly contrary to a proper enablement analysis.  "The dispositive question of enablement does not turn on whether <u>the accused product</u> is enabled.  Rather, '[t]o be enabling, the specification of the patent must teach those skilled in the art how to make and use the

---

[110] The court notes that Goodman gave testimony indicating that no undue experimentation was needed to implement the one thousand foot feature of the '585 patent:  *See* D.I. 644 at 259:8-15 (Goodman cross – "Q.  Now, as of the time of your 1991 patent application, people knew how to transmit digital data for long distances over telephone wires; right?  A.  At certain data rates, yes.  Q.  And transmitting digital data for long distances over telephone wires, that could have well have been in excess of 1,000 feet right?  A. Right.").

[111] *See Liebel-Flarsheim*, 481 F.3d at 1379 ("[W]here the specification teaches against a purported aspect of an invention, such a teaching 'is itself evidence that at least a significant amount of experimentation would have been necessary to practice the claimed invention.'") (quoting *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir.2003)).

[112] Emphasis added (citing testimony that ADSL "transmits on the order of 16,000 feet.").

*full scope* of <u>the claimed invention</u> without undue experimentation.'"[113]   More surprising

to the court is that EarthLink's accused product based enablement argument was

previously rejected by the court in its preclusion of Waring's enablement testimony

recited in his expert report.  In precluding Waring's enablement testimony, the court

stated:

> By requiring that the patent enable an end-to-end ADSL system, defendants ignore the rule that the specification "need not enable anything broader than the scope of the claims."  This protects patentees from having someone avoid infringement merely by adding one additional element to an otherwise infringing product.  This distinction is particularly important in the present matter because the accused system contains features that are not part of the claimed system, but which Waring contends must be enabled by the specification.  For example, according to Waring, "ADSL is designed to operate over distances of up to approximately three miles [approx. 18,000 feet] and do so without any additional amplification mid-way along the transmission path."  He concludes that 1,000 feet is the farthest distance discussed in the patent specifications, and therefore, the patents do not enable one of ordinary skill in the art to make an ADSL system which operates distances of 18,000 feet.

> * * * * *

> Thus, while defendants' ADSL service allegedly uses the claimed system to infringe, that does not mean that the patent specification must enable the ADSL service as opposed to merely the claimed system.[114]

The court again rejects EarthLink's argument that the patents-in-suit must enable

the accused product, and that the accused product embodies the full scope of the

claims at issue.

The court finds that substantial evidence was not presented to support the jury's

---

[113] *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1306 (Fed. Cir. 2001)  (quoting *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir.1997)) (alteration and italicization in original, underlining added).
[114] D.I. 613 at 8-9 (footnotes and citations omitted).

verdict of invalidity of the claims of the patents in suit based on lack of enablement and, therefore, grants Inline's JMOL motion on that issue.

### 2.   Written Description

The jury returned a verdict that each of the claims at issue were invalid for failing to comply with the written description requirement of 35 U.S.C. § 112, ¶ 1 which requires a patent specification to contain an adequate written description.  An adequate written description must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the applicant] was in possession *of the invention*.  The invention is, for purposes of the 'written description" inquiry, *whatever is now claimed*."[115]

> The purpose of the written description requirement is to prevent an applicant from *later* asserting that he invented that which he did not; the applicant for a patent is therefore required to recount his invention in such detail that his *future* claims can be determined to be encompassed within his *original* creation.[116]

In reviewing a jury's findings on written description, the "court must accord deference to [those] findings [and] . . . will not substitute its judgment for that of the fact finder."[117]

Inline contends that EarthLink failed to present substantial evidence to sustain the verdict on this issue.  In its opening brief, Inline contends that EarthLink sought to

---

[115] *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991) (emphasis in original).

[116] *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1319 (Fed. Cir. 2003) (internal quotation marks and citation omitted) (emphasis in original); *Purdue Pharma, L.P. v. F. J. Faulding & Co.*, 48 F. Supp. 2d 420, 427 (D. Del. 1999), *aff'd*, 230 F.3d 1320 (Fed. Cir. 2000) ("The policy behind the written description requirement is to prevent overreaching and *post hoc* claims that were not part of the original invention."); *id.* at 430 ("The very purpose of the written description requirement is to show that at the time of filing, the inventor was in possession of what is now claimed.").

[117] *Union Oil Co. v. Atlantic Richfield Co.*, 208 F.3d 989, 996 (Fed. Cir. 2000); *see also Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) ("Whether a specification complies with the written description requirement . . . is a question of fact . . . .").

establish lack of adequate written description through the testimony of Waring, but that

his testimony cannot be substantial evidence to sustain the verdict on this issue.

Specifically, Inline notes, citing *Moba B.V. v. FSP Food Processing Sys., Inc.*,[118] that a

written description analysis examines whether the inventor possessed the claimed

invention, not whether he possessed or invented the accused technology.  Accordingly,

Inline maintains that Waring's testimony concerning whether inventor Goodman

developed or was aware of ADSL is irrelevant to the proper inquiry, i.e., whether there is

adequate description of a data transmission system that met the claim limitations, and

not the particular system accused of infringement.

Next, Inline argues that Waring's criticism of the patents for not teaching enough

about non-video embodiments is also irrelevant and incorrect, as the patents specifically

describe transmitting signals and information in general.  Inline insists that Waring

merely provided conclusory testimony that the description in the patents was insufficient

and, at best, was relevant only to enablement.  Moreover, Jackson testified that a skilled

artisan would have easily understood that disclosure of a type of "information," i.e.,

video signals, amply supported a claim to "information" in general and other types of

signals including digital computer signals.

Finally, Inline contends that Waring's testimony regarding transmission

distance[119] again improperly focuses on the thousands of feet the accused ADSL

systems transmit rather than the question of whether Goodman disclosed enough to

---

[118] 325 F.3d 1306, 1321 (Fed. Cir. 2003).
[119] Transmission distance is an issue implicated only by the claims of the '585 patent, which recite transmission over 1,000 feet.

49

demonstrate possession of the claimed invention.  Inline maintains that, nevertheless, the '585 specification discusses feasible transmission of distances over 1000 feet and, therefore, demonstrates possession of the claimed invention.

EarthLink casts this question as one in which the jury was asked to decide between the expert opinions of Waring and Jackson, as two individuals of ordinary skill in the art.  EarthLink contends that the record provides multiple independent bases to support Waring's opinion, and the jury's conclusion, that the written description requirement was not met.  In support, EarthLink points to:  (1) Waring's testimony that the patent contains no teachings about how to transmit digital data, and that the actual teachings of the specification were transmission of analog video over relatively short distances; (2) that the jury could reasonably have concluded that the specification taught away from distances significantly beyond 1,000 feet; (3) Waring's testimony about the differences in filtering between the frequencies used in the analog NTSC video transmission described in the specification versus what is required for ADSL; and (4) evidence concerning Goodman's actions and state of mind, in that Goodman had not heard of ADSL at the time he filed his 1991 application even though that technology was publicly known in 1991; and that Goodman purportedly did not envision that his invention could cover ADSL at that time.

Inline responds with the contention that EarthLink did not rebut any of the points raised by Inline in its opening brief; and maintains that the arguments raised by EarthLink in its opposition motion are insufficient to defeat its JMOL motion on the written description issue.

Analog versus Digital Transmissions

According to EarthLink, Waring explained that the patent had no teachings about how to transmit digital data[120] and that the actual teachings of the specification were transmission of analog video over relatively short distances.[121]   Waring testified that the insertion of the word "computer" or an occasional use of the word "data" in the specifications cannot substitute for actual teachings of data solutions.[122]   Waring stated that the specification discloses the transmission of NTSC signals from one device to another, and that the occasional use of the word "data," "digital," or computer" did not change his conclusion as one of ordinary skill in the art:

> When I would bump into those words I would look at how it was used in context and look for elaboration and in particular I would look for teaching associated with it.  I found very little teachings.  In other words, the words may be used but there is not much description beyond that.[123]

EarthLink contends that the specification's mere inclusion of words like "data," "digital," "computer," or "Ethernet" is the only thing Inline points to in attempting to overcome the jury's verdict on written description.  Finally, EarthLink points to the

---

[120] D.I. 654 at 88:14-17 (Waring direct – "The patent specification, first of all, all the teachings are about analog video signals and none of them teach how one would transmit digital data over these very long phone lines.").

[121] D.I. 649 at 239:22-240:5 (Waring direct – "The specification is about a system for moving video over relatively short phone wires in the home maybe just outside the home and these are analog video signals such as a television channel.  And, in fact, the specification talks a lot about things such are your remote control that you would use to change channels.  It talks about VCRs and television sets.  And the teachings in the specification are all consistent with that."); D.I. 654 at 112:9-12 (Waring cross – "I think [Goodman] was still largely moving the analog NTSC signal from one point to another and it happened to have invented in it the closed-captioned data.  He wasn't operating specifically on the closed-captioned display.").

[122] D.I. 649 at 240:6-21 (Waring direct – "Q.  Mr. Waring, we heard testimony and we have actually seen words in the specifications that mention digital, mention data, mention computer.  Have you taken that into account in your analysis?  A.  I have taken that into account in my analysis.  There are these words in the specification.  But I also have to look at what the teachings are that are associated with that, and whether that is elaborated upon in a way that one of skill in the art could understand it and comprehend it.  Q.  And at the end of the day, when you . . . read the specification, your conclusion was that –  A.  My conclusion was that this taught the transmission of video signals, analog and TSC video signals over relatively short distances over a home.  But they don't teach anything about AD[SL], which is up to a three-mile phone line back to the central office.").

[123] D.I. 654 at 82:10-15 (Waring direct).

following Waring testimony as specifically refuting Inline's arguments:

Q.  What would be your opinion of somebody that read the specification that had an undergraduate degree in electrical engineering and two years of communication experience as to whether they would have reached the conclusion that the claims in this case were broad enough to cover an ADSL transmission system based on the written specification?

A.  Well, based on the written specification, which is all about NTSC video signals over phone wiring in the home, I don't believe one of skill in the art would have come to the conclusion that the specification was about an ADSL system.

Q.  Now, there has been some discussion between you and Mr. Lewis about digitizing video?

A.  Yes.

Q.  And when you read the patent specification, would one of skill in the art have been able to learn how to digitize video by reading the patent specification?

A.  No.

Q.  And he mentioned that the patent has, I don't know whether it was occasional or periodic, discussing references to the Ethernet?

A.  Correct.

Q.  When you received the patent specification, did you consider it to be describing to one of skill in the art basically how the builder uses an Ethernet?

A.  It mentioned Ethernet in passing as an example of computer data.  But that was about it.  There was very little other additional discussion or teaching.

Q.  Same question with respect to digital encoding?

A.  Well, it just referenced the fact that video signals can be digitally encoded.

Q.  Does it in fact teach someone to do the digital encoding?

52

A. No.[124]

EarthLink contends that Inline relies on Jackson's testimony on this issue, but notes that this was a fact question and that, for the purposes of Inline's JMOL, the court must presume that the jury completely disregarded Jackson's testimony, leaving only Waring's testimony which it argues is sufficient to satisfy the JMOL standard.

Inline presents four reasons that EarthLink's "digital data vs. analog data" argument is without merit.  First, Inline maintains that the argument is irrelevant because no claim limitation requires transmitting digital or analog signals, and that EarthLink did not cite any.  Second, Inline maintains that EarthLink's argument regarding ADSL is a "red herring" because a non-infringement position "in the cloak of a validity challenge" is legally incapable of establishing a written description violation.[125]  Third, Inline states that EarthLink mistakenly argues that the words "computer," "data," or "Ethernet" cannot replace "actual teachings of data solutions."  Inline reiterates that no claim element requires digital signal transmission and that EarthLink failed to respond to passages discussing signal/data transmission cited in its opening brief.[126]

---

[124] D.I. 654 at 183:9-184:17 (Waring redirect).

[125] *Moba BV v. FPS Food Processing Sys., Inc.*, 325 F.3d 1306, 1321 (Fed. Cir. 2003) (finding adequate written description and rejecting argument that the patent did not disclosed the accused apparatus because it "merely revives its non-infringement argument in the cloak of a validity challenge").

[126] Inline's opening brief listed the following passages from the common specification discussing signal/data transmission:

"The present invention relates to a system for simultaneous two-way communication of video signals and *other signals* between . . . ." '596 patent, 1:22-25 (emphasis added).

"The communications systems disclosed in the parent and first and second CIP applications are designed to simultaneously transmit telephone signals and *non-telephonic signals (such as cable television signals, other video signals, audio signals, data signals, and control signals)* across the active telephone wiring . . . . *The present invention adds to these techniques, providing distribution of all of these signals* . . . ." '596 patent, 1:56-64 (emphasis added).

"This would enable subscribers to communicate video signals and *other relatively wide bandwidth signals* in

Fourth, and finally, Inline insists that EarthLink's quotation of Waring's testimony again skirts the issue at hand.  It states that the first third of the quotation addresses whether the patents disclose ADSL, allegedly recycling EarthLink's non-infringement position "in the cloak of a validity challenge."[127]  Inline states that Waring's remarks that the patents do not teach how to use or build digitized video, Ethernet, or digital encoding are relevant, if at all, to enablement; they have nothing to do with the claims (which require the transmission of only "signals") or the written description requirement, which focuses on possession of the claimed inventions, not their enablement.

The court agrees with Inline with regard to EarthLink's digital versus analog argument.  The court notes first Inline's argument that no claim limitation requires transmitting digital or analog signals, and that EarthLink did not cite any.  Moreover, Inline's opening brief clearly sets forth its contention that in considering whether there is an adequate written description, the focus on whether the inventor possessed the claimed invention, rather that whether he possessed or invented the accused technology.  Much of the evidence cited by EarthLink, however, refers to whether the

---

the same way that they currently communicate voice signals."  '596 patent, 3:9-11 (emphasis added).

"In this application, the technique for communications across a PBX is expanded to provide the same capabilities for wiring networks that provide the conductive paths of a *computer* local area network (LAN)." '596 patent, 7:30-34 (emphasis added).

"The invention also provides two-way *communications of signals of a general nature* with the high capacity transmission line."  '596 patent, 8:37-39 (emphasis added).

Inline also referenced Waring's testimony which acknowledged that the patent discusses data more broadly than merely video:  "Q.  Is it your impression that the specification of the patents talked about video and nothing else whatsoever?  A.  No.  I think I said that there are references to things such as digital and local area networks, and so forth.  There is mention –  Q.  There is reference to digital data?  A.  Yes, there is.  Q.  There is reference to computer data, is there not?  A.  Yes, there is."  D.I. 654 at 109:19-110:2 (Waring cross).

[127] *Moba*, 325 F.3d at 1321.

specification describes ADSL, e.g., the specification "do[esn't] teach anything about AD[SL], which is up to a three-mile phone line back to the central office"; "I don't believe one of skill in the art would have come to the conclusion that the specification was about an ADSL system"; and "I don't believe one of skill in the art would have come to the conclusion that the specification was about an ADSL system."  Inline is also correct that other of Waring's testimony is related to enablement, rather than possession of the claimed inventions, e.g., whether the specification describes to one of skill in the art "how to digitize video"; "how the builder uses an Ethernet"; and whether it "teach[es] someone to do the digital encoding."  Although EarthLink's evidence concerning ADSL may have been pertinent to its non-infringement defense, the court determines it is not substantial evidence to support the jury's verdict that the specification has inadequate written description of the claimed invention.

Distance

EarthLink contends that the jury could reasonably have concluded that the specification taught away from distances significantly beyond 1,000 feet and, therefore, the written description requirement is not met.[128]  Waring testified that the teachings in the patent related to hardware (transceivers and a signal interface) and frequency levels that could transmit over telephone wire for distances that were no more than several hundred feet, but that the claim scope covered hardware and frequency levels that transmitted over telephone wires for multiple thousands of feet.[129]  EarthLink contends

_____

[128] Only the claims of the '585 patent include a limitation referencing transmission of distances over 1,000 feet.  Independent claim 1 of the '585 patent includes the limitation that "each of said separate conductive paths exceeds 1000 feet in length."
[129] D.I. 654 at 86:22-88:3 (Waring direct); *see also* D.I. 644 at 255:15-18 (Goodman cross).

that the specification describes 1,000 feet as the outer boundary of the claimed system and, therefore, the specification effectively teaches away from distances substantially in excess of 1,000 feet, a point EarthLink states that Goodman was forced to concede.[130] EarthLink states that Beckmann admitted that "the transmission distances were mentioned up to 1,000 feet."[131]  EarthLink contends that this evidence supports the jury's verdict, because evidence that the specification teaches away from certain embodiments within the claim scope also supports a finding of lack of written description.

The court finds the evidence with regard to transmission distance cited by EarthLink as insufficient to support the jury's verdict on written description.  The claims of the '585 patent requires "conductive paths exceed[ing] 1000 feet in length," but the testimony cited by EarthLink is directed primarily at whether the specification describes the multiple thousands of feet transmitted by the accused ADSL system.  With regard to the requirement of the claims at issue, the court disagrees that Goodman conceded that 1000 feet was the outer boundary of the invention described in the specification. Goodman testified that the specification described "a system that goes beyond one thousand feet," and reiterated later in his testimony that he did not consider 1,000 feet to be the outer boundary described in the specification.  Also, though Beckmann stated that "the transmission distances were mentioned up to 1,000 feet," he went on to testify that "given the techniques that were developed in this system, there is no reason

---

[130] D.I. 644 at 256:11-19 (Goodman cross); *id.* at 259:24-261:7 (Goodman cross); '585 patent at 14:55-62.

[131] D.I. 654 at 220:8-21 (Beckmann direct).

whatsoever to think that those could not be distributed farther if the amount of data was similar to the amount of data that is carried, for example, over ADSL systems today."[132] Furthermore, the specification also recites transmission distances exceeding 1,000 feet: noting attenuation is estimated to "occur[] before the lengths of extended pairs 405 reach 3000 feet";[133] and stating that "connecting ten houses to a single transceiver/switch 400 may mean that some of extended pairs 405 will be longer than, perhaps, 1000 feet."[134]  For these reasons, the court rejects EarthLink's arguments concerning transmission distance as sufficient support for the jury's verdict on written description.

Filtering

EarthLink points to Waring's testimony concerning the differences in filtering between the frequencies used in the analog NTSC video transmission described in the specification versus what is required for ADSL.[135]  Earthlink contends that Goodman admitted that his patent did not describe any filters with the cut-off properties necessary for ADSL.[136]  EarthLink also states that Jackson acknowledged that the filtering necessary for ADSL was a challenging problem and that no filter in the specification was "up to the challenge" of filtering in the ADSL environment.[137]  EarthLink contends

---

[132] The court notes Inline cites testimony from Goodman, Jackson, and Beckmann supporting its argument that a skilled artisan would understand that the video signals discussed in the patent require more bandwidth than other types of signals (such as computer data) and that, as a result, those other types of signals could reach father, to distances much greater than 1000 feet.  D.I. 646 at 50:23-51:23 (Goodman redirect); *id.* at 125:20-126:2 (Jackson direct ); D.I. 654 at 220:22-221:12 (Beckmann direct); *see also* D.I. 644 at 259:8-15 (Goodman cross).

[133] '585 patent at 15:2-3.

[134] '585 patent at 14:60-62.

[135] D.I. 654 at 85:7-86:21 (Waring direct).

[136] D.I. 644 at 235:3-236:6 (Goodman cross).

[137] D.I. 646 at 240:5-22 (Jackson cross).

that this evidence also supports the jury's verdict.

Once again, EarthLink cites to evidence in support of its written description argument that has to do with whether the specifications describe the accused ADSL system, rather than whether the claims at issue are adequately described.  The court again determines that such evidence is inadequate to support the jury's verdict on written description.

Goodman's Actions and State of Mind

EarthLink contends that evidence concerning Goodman's activities and motivations is highly relevant.  First, EarthLink argues that Inline's patent counsel began drafting the claims of the patents-in-suit approximately 7 years after the date of the application.[138]  Goodman testified that he had not known about ADSL at the time he filed his 1991 application; that ADSL was publicly known at that time; and that he did not did not envision that his invention could cover ADSL at that time.[139]  EarthLink also contends that two years after learning about ADSL, in October 1993, Goodman argued to the ADSL standards body that splitterless ADSL could not work.[140]  EarthLink also states that Goodman admitted that he employed a "keep it alive" strategy to monitor

---

[138] D.I. 644  at 242:9-245:20 (Goodman cross).

[139] D.I. 644 at 212:4-19 (Goodman cross – agreeing that Bellcore first developed ADSL in the late 1980s and that Goodman first learned about ADSL in 1992); *id.* at 213:13-214:2 (Goodman cross – agreeing that at the time the 1991 application was filed there was no way Goodman could have believed the disclosure covered ADSL since he did not know what ADSL was at the time of that filing); *see also id.* at 242:3-8 ("Q. Okay.  And I believe that you already testified that at the time you filed this 1991 application, you did not envision that this patent specification covered ADSL; is that correct?  A. I didn't know what ADSL was at the time.  I knew it covered data over voice application.").

[140] D.I. 644  at 250:14-254:19 (Goodman cross – testifying about his submission to the ADSL Standards process and his criticism of having the transceiver on the internal wiring of a house and the need to apply a low-pass filter to each telephone device).

industry developments so that he could draft claims to cover later developments.[141]

Finally, Goodman testified that when drafting the '585 patents claims targeting ADSL

transmission, he relied on a book concerning digital subscriber line technology.[142]

Citing *Gentry Gallery, Inc. v. Berkline Corp.*,[143] EarthLink suggests that its

proffered evidence concerning Goodman's activities and motivations is highly relevant

to the written description issue.  There, the Federal Circuit reversed a district court's

judgment following a bench trial, and found a patent invalid for lack of written description

based in part on an inventor's admission that he amended claims to cover the accused

device after learning about the device in the market:

> Finally, although not dispositive, because one can add claims to a pending
> application directed to adequately described subject matter, Sproule
> admitted at trial that he did not consider placing the controls outside the
> console until he became aware that some of Gentry's competitors were so
> locating the recliner controls.[144]

EarthLink contends it is precisely for these circumstances that the "[a]dequate

description of the invention guards against the inventor's overreaching by insisting that

---

[141] D.I. 644 at 243:19-246:21 (Goodman cross – testifying that during the time he filed applications after rejection containing the same claims (which he called a "keep-it-alive" strategy), he became involved with the ADSL standards committee– attending meetings and making submissions to that committee –but failed to tell the committee he has a patent application he believed covered ADSL); *see also id.* at 248:2-7 (Goodman cross – "Q.  And when it came time to draft the '585 patent claims, you were in fact targeting ADSL transmission claims?  A.  Yes.  Q.  That was your goal?  A.  That was my goal."); D.I. 646 at 23:21-24:3 (Goodman cross – "Q.  I want to go back to the '585 patent application for one second.  You told us yesterday at the time of the '585 patent application that you were in fact targeting ADSL.  Right?  A.  Yes.  Q.  that was the purpose of the claims you were drafting, was to target ADSL?  A.  Yes.").

[142] D.I. 644 at 248:2-25 (Goodman cross – "Q.  [When drafting the claims of the '585 patent] you actually relied on a book; is that correct?  A.  I relied on a book, sure. . . .  A.  Yes, I knew when I would write claims with my patent attorney, the other side would be aggressive and turn my words in some other way in order to avoid infringement so I wanted to be careful about how I wrote it and so  I could write them so as to protect myself.  Q.  But the book that you relied on was Understanding Digital Subscriber Line Technology?  A.  That's right.  Q.  Okay.  A.  That's one of the books I relied upon.  you said the book.  Q.  You relied on other ADSL?  A.  I remember looking at other references at that time."); D.I. 646 at 26:23-28:20 (Goodman cross – testifying that he relied on the previously referenced book while drafting the claims of the '585 patent).

[143] 134 F.3d 1473 (Fed. Cir. 1998).

[144] *Id.* at 1479.

he recount his invention in such detail that his future claims can be determined to be encompassed with his original creation."[145]

Although Goodman acknowledged he was not aware of ADSL until 1992, Inline points out that his testimony was that he was in possession of his invention since the filing of his original application.[146]  Inline is also correct that Goodman did not state that splitterless ADSL "would not work" in his submission to the ADSL standards body; rather, that submission set forth his opinion that splittered ADSL was better able to handle transmitting video to the phone "which was the application in 1993, was the only application."[147]

Again, the written description requirement examines the claimed inventions, not the accused product, to which EarthLink's evidence concerning Goodman's actions and state of mind is directed.  Moreover, even if Goodman's goal was to write claims which would cover ADSL, such practice is not *per se* improper.[148]  Moreover, EarthLink's

---

[145] *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991).

[146] D.I. 644 at 242:3-8 (Goodman cross).

[147] D.I. 644 at 250:14-254:19 (Goodman cross – agreeing that his submission opined it was "*better* . . . having the transceiver and the modem at the side of the house as opposed to at the internal jack"; that one of the "*drawbacks* with having the transceiver on the internal wiring" was "that an extremely sharp expensive and presumably unwieldy low-pass filter must be applied to every telephone device to prevent the higher harmonics"; and that in his "submission you are expressly criticizing the system for ADSL as implemented today; is that correct?  A.  No.  I'm criticizing the use of splitterless ADSL for transmitting video to the phone, which was the application in 1993, was the only application"; and where low-pass filters are put in the house, that "arrangement is sure to degrade reception of the downstream ADSL signal, significantly constricting the distance/bitrate tradeoff curve.  This stands in direct conflict with the spirit of ADSL, which is to realize the maximum possible bitrate across the external wires.") (emphasis added).  Though Goodman's 1993 submission clearly criticized splitterless ADSL, that submission did not state such configuration "would not work."

[148] *See Kingsdown Med. Consultants, Ltd. v. Holliser Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) (considering an inequitable conduct argument) ("It should be made clear at the outset of the present discussion that there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; *nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application.*  Any such amendment or insertion must comply with all statutes and regulations, of course, but, if it does, its genesis in the marketplace is simply irrelevant and cannot of itself evidence deceitful intent." (citing *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1235 (Fed. Cir.1985))

reliance on *Gentry Gallery* is also unpersuasive.  As the quote cited by EarthLink

explicitly states, the fact that consideration of placing controls outside the console came

after awareness of competitor's products was "not dispositive" but, rather, was

additional evidence to support the determination that the written description requirement

was not met in that case.  There, the patent-in-suit contained broad claims for a

sectional sofa wherein controls for a pair of parallel recliners were not limited to

placement on a console between the recliners and narrower claims which did contain

that limitation.[149]  The Federal Circuit held that the broader claims failed to satisfy the

written description requirement because the written description clearly described the

central console as the only location for the controls.[150]  Here, EarthLink focuses on

evidence concerning the timing of Goodman's knowledge concerning ADSL and the

drafting of his claims, rather than specifically focusing on particular claim elements

purportedly not supported by the written description.[151]  The court determines, therefore,

that EarthLink has failed to cite evidence which clearly and convincingly demonstrates

that Goodman's actions and state of mind, separately or in combination with the other

evidence cited in opposition to Inline's motion, supports the jury's verdict of invalidity for

failure to comply with the written description requirement.  Consequently, Inline's JMOL

on that issue is granted.

---

(emphasis added).

[149] *Gentry Gallery*, 134 F.3d at 1475.

[150] *Id.* at 1479; *id* (stating that, *inter alia*, "the original disclosure clearly identifies the console as the only possible location for the controls"; "the only discernible purpose for the console is to house the controls"; "[the] broadest original claim was directed to a sofa . . . with 'control means located upon the center console . . . .'").

[151] EarthLink did discuss the transmission distance of more than 1,000 feet in the '585 patent, which the court determined, above, was shown by the evidence to be adequately described.

D.    Non-infringement

"Infringement is a question of fact, findings of which are accorded substantial deference on review."[152]   The jury found no infringement of any of the asserted claims. Inline contends that it made a prima facie infringement case by presenting testimony from various fact witnesses and by offering the testimony of its infringement expert, Jackson.   According to Inline, Jackson testified about each limitation and stated how the accused systems met each element and concluded that EarthLink's splitterless ADSL system contain each of those limitations and, therefore, infringes.

Inline states that EarthLink did not offer any witnesses–including an expert witness–to testify on non-infringement and that EarthLink relied entirely on its cross-examination of Jackson to show that EarthLink failed in its burden to establish infringement.

EarthLink contends Inline's motion for JMOL of non-infringement must be denied for at least two reasons:  (1) the record allowed the jury to determine that Inline had not carried its burden with respect to infringement; and (2) the jury could have determined that the evidence showed that the telephones (a required element of every asserted claim) are not part of the accused EarthLink ADSL system.

> In reviewing the evidence in the record while considering a JMOL motion, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  Thus, although the court should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe.*  That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is *uncontradicted and unimpeached*, at least to the

---

[152] *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1348-49 (Fed. Cir. 2000).

extent that that evidence comes from *disinterested witnesses*.[153]

Burden on Infringement

EarthLink contends that Inline did not carry its burden on infringement.  EarthLink first argues that because Jackson was Inline's paid expert (and its entire infringement case rested on his testimony), he was not a disinterested witness and the jury was free to disregard his testimony.  Inline argues that an expert is not *per se* biased for receiving compensation for his services and notes that EarthLink did not cite precedent supporting such assertion.  The court agrees with Inline's position that the fact that Jackson was a witness compensated by Inline, in and of itself, is insufficient reason for the jury to completely disregard his testimony.[154]

EarthLink also argues that Jackson's testimony was heavily impeached during cross-examination and, therefore, the jury could have rejected his testimony because of that impeachment.  Examples of this purported impeachment include:  (1) testimony that the title of the ADSL industry standard regarding low-pass filters ("In-Line Filter for Use with Voiceband Terminal Equipment . . .") was adopted as a result of Goodman's use of

---

[153] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citations and internal quotation marks omitted) (emphasis added); *see also Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1065 (Fed. Cir. 1998) ("'[C]ourts often caution that granting a [JMOL] for the party bearing the burden of proof is reserved for extreme cases." . . .  Accordingly, grant of JMOL in favor of a party bearing the burden of proof may be granted only where (1) the movant 'has established [its] case by evidence that the jury would not be at liberty to disbelieve' and (2) 'the only reasonable conclusion is in [the movant's] favor.'") (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2535, at 325 (2d ed. 1994) & *Hurd v. American Hoist & Derrick Co.*, 735 F.2d 495, 499 (10th Cir. 1984)).

[154] *See, e.g., Richardson v. Perales*, 402 U.S. 389, 403 (1971 ("Although each [physician] received a fee, that fee is recompense for his time and talent otherwise devoted to private practice or other professional assignment.  We cannot, and do not, ascribe bias to [their] work . . . ."); *see also Clark v. Eagle Nest, Inc.*, 166 F.3d 1208, (4th Cir. 1998) (Table) ("The Supreme Court has held, however, that bias cannot be presumed merely because an expert is compensated for his opinion.") (citing *Perales*, 402 U.S. at 403).

the term "Inline," the plaintiff corporation;[155] (2) prior inconsistent statements from his declarations;[156] (3) testimony concerning the phrase "destinations of information" contained in claim 1 of the '446 patent;[157] (4) further inconsistent testimony about the frequency bands used between the central office and the remote terminal; the functionality of an industry standard DSLAM; and admissions the jury could have taken to support non-infringement positions;[158] and (5) foundational testimony concerning conception of the idea that sparked ADSL in 1988-89 Earthlink characterizes as presenting Jackson in an unappealing light as a witness.[159]

Not surprisingly, Inline argues that Earthlink mischaracterizes and distorts Jackson's testimony. The court, however, will not make determinations about the credibility of witnesses as such determinations are to be made by the jury. Furthermore, EarthLink points to the following portions of the jury instructions (to which EarthLink contends Inline did not object) concerning evidence and the consideration thereof, and credibility of witnesses, in general, and expert witnesses, in particular, as support for its position that the jury could reject Jackson's testimony.

> **1.5  Consideration of Evidence**  You should use your common sense in weighing the evidence. . . .  Give it whatever weight you believe it deserves. . . .

> **1.6  Direct and Circumstantial Evidence**  . . .  Direct evidence is simply evidence like testimony of an eyewitness which if you believe it, directly

---

[155] Citing PX-152; D.I. 646 at 233:7-234:12 (Jackson cross); 234:13-237:18 (Jackson cross); D.I. 649 at 228:10-229:1 (Waring's direct testimony regarding the term "inline").

[156] D.I. 646 at 229:6-230:16 (Jackson cross), 231:7-233:1 (Jackson cross).

[157] D.I. 649 at 182:3-186:3 (Jackson cross); 192:19-193:15 (Jackson redirect); 201:8-202:9 (Jackson recross).

[158] D.I. 649 at 169:21-170:21 (Jackson cross); 186:25-188:3 (Jackson cross); 171:8-174:18 (Jackson cross); 180:3-181:3 (Jackson cross).

[159] D.I. 646 at 238:12-239:4 (Jackson cross).

proves a fact. . . .  It is your job to decide how much weight to give direct and circumstantial evidence. . . .  You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

* * *

**1.8  Credibility of Witnesses**  In determining the weight given to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact. . . .  Impeachment of a witness, whether a fact witness or an expert witness, occurs when his or her testimony is contradict by other evidence and can be considered when judging the credibility of that witness.

* * *

**1.10  Expert Witnesses**  When knowledge of technical subject matter may be helpful to the jury, a person who has specialized training or experience in that technical field – called an expert witness – is permitted to state his or her opinion on those technical matters.  However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely upon them.

The court agrees with EarthLink that a reasonable jury could have determined that Jackson was impeached during his testimony and, therefore, lacked credibility. Based on such determination, the jury could reasonably have returned its non-infringement verdict.  Consequently, Inline's motion for JMOL of infringement is denied.

"Use" of the Claimed Inventions

EarthLink's second argument against Inline's motion for JMOL of infringement is that it did not establish that EarthLink infringed the patents-in-suit under 35 U.S.C. § 271(a), which provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."  The claims of the patented invention require one or more telephones.  Because EarthLink

65

insists that ADSL neither requires nor uses telephones in any way, it does not "use" the patented invention.

On February 1, 2007, the court granted Inline's motion for summary judgement regarding use under 35 U.S.C. § 271(a) "to this extent:  should Inline establish at trial that [EarthLink's] ADSL service infringe[s] the patents, [EarthLink] cannot avoid liability for infringement on the basis that [it] do[es] not use the patented inventions as defined under § 271(a)."[160]  According to Inline, that ruling rejected EarthLink's argument at summary judgment and again answers the question as to its JMOL motion. Secondarily, Inline maintains that the telephones are not part of the system for communicating information which is claimed and EarthLink is using.  It asserts that the telephones recited in the claims merely indicate the positions of the filters and other elements of the system, so that the presence of telephones in the accused ADSL system is irrelevant.

In support of its argument, EarthLink contends that the evidence established that ADSL neither requires nor uses telephones; that other evidence demonstrated that telephones are an impediment to ADSL; and that there was more than sufficient evidence for the jury to find that the telephones were not part of EarthLink's ADSL system.  In response to Inline's contention that the court's February 1, 2007 order precludes its current argument, EarthLink contends that its current non-infringement position was not addressed in that order.

EarthLink explains that under the court's order, if Inline had proven that the

---

[160] *Inline Connection Corp. v. AOL Time Warner Inc.*, 272 F. Supp. 2d 598, 600 (D. Del. 2007).

telephones were part of EarthLink's "ADSL system," EarthLink could not avoid infringement by saying it did not sell, own, or control that component.  EarthLink contends that Inline did have to prove, however, that the telephones were part of EarthLink's ADSL services in the first place to "establish at trial that defendants' ADSL services infringe the patent."  EarthLink states that Inline could not make EarthLink directly liable for infringing a claim element simply by choosing to arbitrarily label something as part of a "system." It argues that, if such were the case, then proof of direct infringement would be nothing more than an exercise in creative pleading (e.g., if the claim required a refrigerator in addition to everything else, EarthLink could not be liable for direct infringement based on the refrigerator in the user's home just because Inline decided to label the refrigerator as part of EarthLink's ADSL service.).

Earthlink contends that all of the evidence supported its position that the phones are not part of its ADSL service.  EarthLink employee Greg Collins testified that the point of the low pass filters is to *eliminate* telephones from an ADSL system.[161] EarthLink executive Jim Anderson testified that, for purposes of DSL service, the customer does not need to have a telephone and that EarthLink does not provide telephones.[162]  Anderson also distinguished the accused ADSL service from the

---

[161] D.I. 646 at 97:7-25 (Collins deposition – "Question:  [W]ith regard to . . . the function of the EarthLink microfilter, what function is it performing?  Answer: The function of the filters that we ship today are to keep spurious high-frequency signals that may come from your telephone from interfering with the DSL. . . . Question:  All right.  But what your are saying is you're trying to keep signals from the telephone off of the internal telephone wiring.  Is that correct?  Answer:  Yes.").

[162] D.I. 649 at 24:20-22 (Anderson direct – "Q.  [F]or the purposes of providing ADSL, does a customer need the telephone?  A.  No."); *id.* at 28-4-14 ("Q.  Then we get into the house, and just using this diagram, what is it that EarthLink is contributing to ADSL?  A.  I am not sure what ATUR stands for.  LDL looks like it's a filter.  Q.  Let me tell you that the ATUR stands for a modem.  A.  Then if ATUR is a modem, then we provide the modem to the modem.  If LTPF looks like is a filter, we provide the filter to the customer.  Q.  How about the computers and the telephones?  A.  We don't provide the computer and we don't provide the telephones.").

telephone service a telephone company may offer, and explained that EarthLink prefers

if customers do not have telephones on the line with ADSL.[163]  Anderson further testified

that ADSL is an access service, and is distinct from any service involving the use of a

telephone.[164]  Earthlink maintains that Jackson's testimony supports its position that

ADSL is an access service, which is distinct from any service involving the use of a

telephone through his repeated references to instances in which people do not have

telephone service but use the accused DSL.[165]

EarthLink contends the above evidence supports the conclusion that telephones

and telephone service are a separate service that is neither necessary nor desirable

from the standpoint of ADSL provisioning, and that EarthLink's accused ADSL service

has no connection to the telephone service at all.  EarthLink notes that, in light of the

court's February 1, 2007 order, it could not have made this argument with respect to

components such as the DSLAM, which it acknowledges is used as part of ADSL

services even though EarthLink does not own or control DSLAMs.  In contrast to

---

[163] D.I. 649 at 24:23-25:6 (Anderson direct – "Q.  [I]f the customer doesn't have a telephone, how does that impact the ability to provide ADSL servicing and potential problems?  A.  It actually simplifies things because the only thing you are worrying about coming over the inside wiring of the house is the DLS signal. These filters are intended to separate the telephone conversations from the DSL signal.  So if there are no telephone conversations you don't need to worry about that.").

[164] D.I. 649 at 42:1-6 (Anderson cross – "Q.  [J]ust to be clear, ADSL is considered an access service; right?  A.  That's correct.  Q.  And the reason that is, is because it gives you access to the Internet; right?  A. Yes."); *id.* at 48:1-6 ("Q.  I'm sure you're familiar with the practice of many telephone companies whose access service you resell that require a telephone customer to have a regular landline telephone number in order to have ADSL; right?  A.  I do know some companies require that, yes.").

[165] D.I. 646 at 180:12-181-14 (Jackson direct – "[I]f you had a configuration of ADSL where there was no telephone in the house, ADSL splitterless from remote terminal came in and it went straight to the modem and then connected with the computer, that would not infringe this claim."  Though Jackson testified such a configuration would not infringe, he believed that "the vast bulk of ADSL subscribers have at least one phone hooked up to the phone wire in their house . . . ."); *id.* at 203:6-13 (Jackson direct – "Q.  And is that on every EarthLink splitterless ADSL system connected through a remote terminal?  A.  No, we talked about it.  There will be some people who don't have phones hooked up . . . [b]ut the vast majority of people will have phones on branch networks and most of them will hook up filters.").

DSLAMs, Earthlink argues that the evidence showed that telephones are not part of EarthLink's "system," rather, that evidence established that the telephones are on the other side of the ADSL boundary point created by the low pas filters.  Because this was a question of fact, EarthLink contends that the evidence was sufficient upon which the jury reasonably concluded the question in EarthLink's favor.

The court agrees with EarthLink's analysis of the court's February 1, 2007 order and is persuaded that, since at least one "telephone device" is an element of each of the asserted claims, the absence of evidence that EarthLink's ADSL system includes that element is substantial evidence upon which the jury could have returned its non-infringement verdict.  For this additional reason, Inline's motion for JMOL of infringement is denied.

E.    New Trial

Lastly, Inline request a new trial on all issues decided be the jury if the court declines to grant its JMOL motion.  According to Inline, because the JMOL standard is higher than the standard for a new trial, the court should also grant Inline a new trial in the alternative for any issue on which the court grants JMOL.  For any issue on which the court determines that substantial evidence supports the jury's verdict, Inline requests that the court independently review the record–including the issues discussed in the JMOL section of its briefs– and grant Inline a new trial because the jury verdicts are against the great weight of the evidence.

"The decision to grant or deny a new trial is committed to the sound discretion of

the district court."[166]   "[W]here the ground for a new trial is that the jury's verdict was against the great weight of the evidence, the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury."[167]   In considering whether a new trial is warranted, "the court need not view the evidence in the light most favorable to the verdict winner. However, a new trial should only be granted where 'a miscarriage of justice would result if the verdict were to stand,' the verdict 'cries out to be overturned,' or where the verdict 'shocks our conscience.'"[168] Having reviewed the record, the court determines that the jury's verdict of non-infringement is not "contrary to the great weight of the evidence," or "wholly irrational," as Inline argues.   Consequently, the court declines to exercise its discretion to order a new trial on that issue and denies Inline's motion.

## IV.  CONCLUSION

For the reasons stated above, EarthLink's motion to file a sur-reply brief (D.I. 694) is granted.   Inline's motion for JMOL on invalidity is granted and its motion for JMOL on infringement is denied (D.I. 681).   An appropriate order will issue concurrently with this motion.

---

[166] *Lucent Technologies, Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 251 (D. Del. 2001) (citing *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) & *Olefins Trading, Inc. v. Han Yang Chem Corp*, 9 F.3d 282 (3d Cir. 1993)).
[167] *Id.* (citing *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993)).
[168] *Id.* (citing *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991)).